## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| JANE DOE,<br><br>            *Plaintiff,*<br><br>    v.<br><br>BROWN UNIVERSITY<br><br>and<br><br>JOHN STILES,<br><br>            *Defendants.* | C.A. No.:1:23-cv-00376-MSM-LDA<br><br><br>Civil Action and<br>Jury Trial Demanded |

## <u>AMENDED COMPLAINT AND JURY DEMAND</u>

Plaintiff Jane Doe ("Jane" or "Plaintiff") brings this action against Defendants Brown University ("Brown" or the "University") and John Stiles ("Stiles" or "Assailant"), based upon her personal knowledge and upon the investigation of counsel regarding all other matters, for Stiles' violent rape of Jane and for the University's failure to comply with the law in connection with Jane's Title IX complaints and for both Defendants' retaliation against Jane for pursuing this protected activity.   In support of her Amended Complaint (the "Complaint"), Jane states as follows:

## <u>INTRODUCTION</u>

1.     On October 30, 2021, Jane, a then eighteen-year-old freshman student at Brown, was brutally sexually assaulted and raped by Assailant, who at the time was also a Brown student and member of Brown's men's lacrosse team.  The rape occurred at what was commonly known as the "senior lacrosse house," where Assailant, as well as other members of Brown's men's lacrosse team, lived.  Without Jane's consent, Assailant penetrated Jane orally, then vaginally, with his penis.  Jane pleaded for him to stop, but Assailant ignored her and continued to rape her,

causing Jane to suffer from significant physical injuries and severe emotional distress.  When Jane started to bleed profusely from the vaginal injuries that Assailant was inflicting on her during the rape, Assailant stopped the assault, called Jane "disgusting," and screamed at her for his blood-drenched sheets and floors.  He then forced Jane to walk down his communal lacrosse house hall naked to the bathroom to shower while he mocked Jane's injuries and the pain and suffering he inflicted on Jane to his friends, including taking pictures and video of his bloody body and genitalia and of his bloody floors, and disseminating those pictures and videos to a group chat with his friends.

2.      As a result of Assailant's violent rape, Jane has suffered severe physical and emotional harm, and brings forth causes of action against Assailant for Battery, Assault, and Intentional Infliction of Emotional Distress.

3.      Jane disclosed Assailant's rape to her Brown gymnastics coach on November 4, 2021, and following this disclosure met with a representative from Brown's Title IX Office on November 5, 2021.

4.      On November 18, 2021, Jane filed a Formal Complaint against Assailant with Brown pursuant to Title IX of the Education Amendments of 1972 ("Title IX"), which states that no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."

5.      Although Brown, which receives federal financial assistance and is required by law to adhere to Title IX, initially suspended Assailant pending the outcome of the Title IX investigation on November 19, 2021, it removed said suspension on December 6, 2021, replacing it instead with campus removal and remote learning.

6.      On December 7, 2021, Brown reactivated Assailant's student status.

7.      On April 26, 2022, *159 days after* Jane registered her formal complaint with Brown's Title IX Office, Brown issued its Investigative Report, but did not release its official findings and disciplinary recommendation until May 12, 2022—*175 days after* Jane registered her formal complaint.  Through its official findings and disciplinary recommendation, Brown determined that Assailant was responsible for Sexual Assault in violation of Brown's Sexual and Gender-based Misconduct Policy.  Even though Brown found that Jane had not consented to vaginal penetration by Assailant, Brown decided that the discipline of Assailant would be limited to placing a notation on Assailant's transcript indicating that he had "violated Brown's policy," without stating what specific policy he violated, require Assailant to complete training on consent, and banned him from Brown's campus for two academic years, even though by the time Brown belatedly determined this discipline, Assailant was graduating from Brown in a month or two.

8.      Jane appealed the unsatisfactory discipline, and Assailant appealed Brown's responsibility finding.  Brown extended and delayed the appeal process well into the summer of 2022, failing to render any findings or additional discipline until August 18, 2022.  On that date, Brown denied Assailant's appeal and granted Jane's, and, in addition to the aforementioned discipline, Brown also stated that it would place a hold on the issuance of Assailant's academic transcripts until he proved that he had completed the required training on consent.

9.      Brown's finding and discipline, however, were entirely meaningless.  By the time Brown's delayed process finally resulted in findings on August 18, 2022, *273 days post-Jane's Formal Complaint*, Assailant had already graduated from Brown, had previously applied to and as of that date, had begun or was about to begin graduate school at a different university in a

different state.  Thus, as a direct and proximate result of Brown's failures, Assailant did not suffer any discipline despite the University's findings of responsibility.

10.    Brown's failure to conduct an adequate and timely investigation into Jane's rape allegations and Title IX complaint effectively ratified the abusive acts committed against her.  As detailed herein, after the filing of Jane's Title IX Complaint and continuing through the present day, Jane continues to suffer significant retaliation from Brown students, faculty, and employees. Jane has also suffered from retaliatory conduct by Assailant.  These collective facts, as further detailed herein, created and continue to create a hostile educational environment, and constitutes discrimination based on sex/gender in violation of Title IX.  In addition to violating Title IX, Brown's investigation of and response to Jane's Formal Complaint of sexual assault was insufficient and did not comply with Rhode Island state law, including the Rhode Island Civil Rights Act ("RICRA"), § 42-112-1 *et seq*., and Brown's own internal policies and procedures discussed herein.

11.    Brown's mishandling of Jane's Title IX Formal Complaint is rendered all the more atrocious given that Brown knew it had a systemic problem of improperly handling sexual harassment and sexual abuse allegations, contrary to its federal mandates under Title IX, and failed to rectify that problem prior to Jane's assault, instead setting up a system that dissuades and actively thwarts reporting of sexual assault and misconduct despite its knowledge of a pervasive and ongoing problem.

12.    As a result of Brown's pattern and practice of misconduct, Jane has been excluded from participation in, has been denied the benefits of, and has been subjected to discrimination at the University.  Brown's and Assailant's misconduct also caused Jane to suffer extreme and severe harm and emotional distress.

## JURISDICTION AND VENUE

13.     The action against Brown is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681, *et seq* ("Title IX").  This Court has subject matter jurisdiction over the Title IX claims based on 28 U.S.C. § 1331, which grants the district court jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

14.     This Court also has subject matter jurisdiction over the Title IX claims pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over:  (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.  Jane's claims are cognizable under the United States Constitution, 42 U.S.C. § 1681 *et seq*. and under Title IX.

15.     This Court also has supplemental jurisdiction over the state law claims against Brown and Stiles pursuant to 28 U.S.C. § 1367.

16.     The events giving rise to this lawsuit occurred in the city of Providence, Rhode Island, which sits in this District.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

17.     Brown and Stiles are subject to the Court's personal jurisdiction with respect to this action.

**THE PARTIES**

18.     Jane is a person of the age of majority and a current student at Brown, and at all times pertinent to this suit resided either on campus at Brown, or in private housing in the city of Providence, Rhode Island.  Jane is a citizen of the State of Rhode Island.

19.     Defendant Brown was at all relevant times and continues to be an educational institution in Providence, Rhode Island, organized and existing under the laws of the State of Rhode Island, with an address at 1 Prospect Street, Providence, RI 02912.

20.     Defendant Stiles is a person of the age of majority and former student at Brown, and at all times pertinent to this suit resided in the city of Providence, Rhode Island.  Upon information and belief, Stiles currently resides in New Hampshire.

**BROWN'S TITLE IX PROGRAM AND ITS NOTICE OF DEFICIENCIES IN SAID PROGRAM PRIOR TO JANE'S RAPE**

21.     At all times relevant to this Complaint, Brown had two policies which guided the University's response to potential Title IX violations: (1) the Title IX Policy,[1] last approved March 19, 2021; and (2) the Sexual and Gender-based Misconduct Policy.[2]

22.     The Title IX Policy includes the following statement of purpose:

This policy prohibits Sexual Harassment, Gender-Based Harassment, Sexual Assault, Dating Violence, Domestic Violence, and Stalking, in addition to Retaliation against an individual for making a report of conduct prohibited under this policy or for participating in an investigation of an alleged violation of this policy.  It also defines Prohibited Intimate Relationships between individuals where one individual has power or authority over another which could create a hostile environment.

---

[1]    https://www.brown.edu/about/administration/title-ix/Sexual%20and%20Gender-Based%20Harassment%2C%20Sexual%20Assault%2C%20Interpersonal%20Violence%2C%20and%20Stalking%20Policy (last visited August 15, 2023).

[2]    https://www.brown.edu/about/administration/title-ix/policies/sexual-and-gender-based-misconduct-policy (last visited August 15, 2023).

This policy is in accordance with Title IX of the Education Amendments of 1972; relevant provisions of the Violence Against Women Reauthorization Act of 2013; Title VII of the Civil Rights Act of 1964; the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act; their implementing regulations; and other applicable federal and Rhode Island state laws and regulations.

23.    The Title IX Policy further reads: "Taking meaningful action when conduct prohibited by this policy occurs is a critical component to Brown's commitment to a campus that is free from discrimination and harassment.  Brown asks faculty and staff in varying leadership roles who oversee the welfare of faculty, staff, students, and University programs to assist us in these efforts by reporting all disclosures or knowledge of Prohibited Conduct to the Title IX Program Officer.  Such reports amplify the University's ability to know what is occurring within its programs and activities and to respond accordingly.  The Title IX Program Officer will conduct an initial assessment of these reports and will do so in a manner consistent with the privacy choices of the Complainant or reporting party."

24.    The Sexual and Gender-based Misconduct Policy includes the following statement of purpose:

This policy prohibits Sexual Harassment, Gender-Based Harassment, Sexual Assault, Dating Violence, Domestic Violence, and Stalking, in addition to Sexual Exploitation and Provision of Alcohol and/or Other Drugs for Purposes of Prohibited Conduct.  This policy also prohibits Retaliation against an individual for making a report of conduct prohibited under this policy or for participating in an investigation of an alleged violation of this policy.

This policy is in accordance with relevant provisions of the Violence Against Women Reauthorization Act of 2013; Title VII of the Civil Rights Act of 1964; the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act; their implementing regulations; and other applicable federal and Rhode Island state laws and regulations.

25.    The Sexual and Gender-based Misconduct Policy addresses prohibited conduct, including sexual assault, that occurs off-campus and is a complement to the Title IX Policy.

26.     Pursuant to Section 3.1.4 of Brown's Sexual and Gender-based Misconduct Policy regarding Mandatory Reports, "Brown asks faculty and staff in varying leadership roles who oversee the welfare of faculty, staff, students, and University programs to assist [] by reporting all disclosures or knowledge of Prohibited Conduct to the Title IX Program Officer."[3]

27.     Pursuant to Section 3.1.5 of Brown's Sexual and Gender-based Misconduct Policy, "[t]he University will accept a report of Prohibited Conduct at any time" and "[t]here is no time limit on submitting a Formal Complaint."  Additionally, "the University will provide reasonably available and appropriate support measures, assist the Complainant in identifying external reporting options, and may take appropriate action to address the Prohibited Conduct," even if the "the Complainant and/or Respondent is no longer affiliated with Brown."[4]

28.     Pursuant to Section 6.0 of Brown's Sexual and Gender-based Misconduct Policy, the "[f]ailure to comply with this and related policies is subject to disciplinary action, up to and including suspension without pay, or termination of employment or association with the University, in accordance with applicable (e.g., staff, faculty, student) disciplinary procedures."[5]

29.     Furthermore, Section 4.0 of Brown's Sexual and Gender-based Misconduct Policy defines retaliation as "any action, statement, or behavior meant as reprisal or retribution against an individual in response to the individual's good-faith report or participation in a proceeding related to this policy.  Any retaliatory action taken directly or indirectly against a person who has made a report, filed a complaint, or participated in an investigation is prohibited."[6]

---

[3]   *Id.*

[4]   *Id.*

[5]   *Id.*

[6]   *Id.*

30.     Both the Title IX Policy and Sexual and Gender-based Misconduct Policy incorporate by reference Brown's Title IX Grievance Procedure, effective March 19, 2021, for responding to Formal Complaints, which are "request[s] for an investigation and initiation of [the] grievance procedure."[7] "Only a Complainant or the Title IX Program Officer can submit a Formal Complaint."[8]

31.     Upon receipt of a Formal Complaint, the Title IX Program Officer will make the following determinations to decide upon the applicability of policies:

- Could the facts set forth by the Formal Complaint, if substantiated, constitute conduct prohibited by the Policy?

- Was the Complainant a Covered Persons as defined in the Policy when the alleged Prohibited Conduct occurred?

- Is the Respondent currently enrolled or employed?

- Did Brown University exercise substantial control over both the Complainant and Respondent at the time in which the alleged Prohibited Conduct occurred?

    If the answer to each question is "YES", then the Policy and this procedure applies, and the Title IX Office has the authority to investigate and resolve the Formal Complaint.

32.     Alternatively, the Title IX Grievance Procedure provides for an informal resolution process that "involves a facilitated resolution that is acceptable to the Complainant and Respondent." Under the informal resolution process, "a full investigation of the allegation is not conducted" and the matter is considered closed once resolved through an informal resolution process." "In all cases, the Title IX Program Officer [has] the discretion to determine whether an informal resolution or mediation is appropriate to the circumstances."[9]

---

[7] https://www.brown.edu/about/administration/title-ix/policies/sexual-and-gender-based-misconduct-policy/sexual-and-gender-based-misconduct-complaint-proc, (last visited August 15, 2023).

[8] *Id.*

[9] *Id.*

33.     The Corporation for Brown University, the University's governing body, also has a policy on Equal Opportunity, Nondiscrimination and Affirmative Action ("Equal Opportunity Policy"),[10] last revised on October 15, 2022, which reads, in relevant part: "Brown University provides equal opportunity and prohibits discrimination, harassment and retaliation based upon a person's race, color, religion, sex, age, national or ethnic origin, disability, veteran status, sexual orientation, gender identity, gender expression, or any other characteristic protected under applicable law and caste which is protected under this policy, in the administration of its policies, programs, and activities."

34.     Moreover, among other things, Title IX requires colleges and universities to:  (i) respond promptly to every reported instance of sexual assault, harassment, or violence; (ii) offer supportive measures to survivors, regardless of whether the survivor chooses to file a formal complaint; (iii) refrain from pressuring a survivor into not filing a formal complaint or participating in a grievance process; (iv) protect survivors from having to come face-to-face with their accused in the Title IX process; and (v) not retaliate against a survivor for reporting sexual misconduct, choosing to file a formal complaint, or choosing to participate in a grievance process.

35.     Brown repeatedly engaged in discriminatory, retaliatory, and other unlawful conduct in its interactions with Jane in response to Jane's report of sexual assault and other sexual misconduct, in violation of Title IX, Brown's own Title IX Policy, Brown's Sexual and Gender-based Misconduct Policy, and the Corporation for Brown University's Equal Opportunity Policy.

36.     Upon information and belief, the training Brown provided for students and employees regarding its sexual misconduct and anti-discrimination policies, definitions, and

---

[10]  https://www.brown.edu/about/administration/corporation/corporation-policy-statement-equal-opportunity-nondiscrimination-and-affirmative-action (last visited August 15, 2023).

investigation and reporting procedures falls far short of the OCR's standards in terms of educating community members at higher education institutions about their rights and obligations with respect to sexual misconduct and sex/gender discrimination on campus.

37.    As part of its Common Data Set initiative, Brown reported 10,257 undergraduate and postgraduate students in Fall 2018; 10,333 undergraduate and postgraduate students in Fall 2019; and 9,948 undergraduate and postgraduate students in Fall 2020.[11]

38.    Upon information and belief, institutions of the same size and scale as Brown generally provide significantly more comprehensive training to students and employees to inform them of their rights and obligations under the institution's Title IX policies than Brown does.

39.    Upon information and belief, at all times relevant to this Complaint, the Title IX Office at Brown did not have a dedicated Title IX investigator to ensure that an institution with approximately 10,000 students and numerous other employees remained free of sex/gender-based discrimination.

40.    Upon information and belief, at all times relevant to this Complaint, the Title IX Office at Brown relied on only two investigators supplied by the Office of Institutional Equity and Diversity (OIED), consisting of an Institutional Equity Officer and an Institutional Equity Investigator, both of whom have responsibilities within OIED unrelated to Title IX.

41.    Brown's Title IX Office was woefully inadequate and insufficiently staffed to meet the needs of its campus and fell well outside the scope of standards required for an institution of Brown's size.

---

[11]  As set forth on Brown's website, the Common Data Set is a standardized set of questions most often asked by parents, students, and other members of the higher education community. https://oir.brown.edu/institutional-data/common-data-set (last visited August 15, 2023).

42.     Upon information and belief, to curb reporting of the increasing number of incidents at Brown, Title IX complaints are purposefully buried or diverted, which means that complaints are never properly investigated or addressed, and offending students are not negatively impacted.   The concealment of Title IX complaints benefits Brown both financially and reputationally, while causing further harm to Jane.

43.     The Title IX Office publishes an Annual Outcome Report on complaints of sexual misconduct brought to the attention of Brown officials and the outcomes of those complaints. According to those Annual Outcome Reports:

- 59 incidents were reported to the Title IX Office between July 2016 and June 2017, but only 12 formal complaints were filed and only 4 findings of responsibility at the time of publication;[12]

- 92 incidents were reported to the Title IX Office between July 2017 and June 2018, but only 9 formal complaints were filed and only 3 findings of responsibility;[13]

- 99 incidents were reported to the Title IX Office between July 2018 and June 2019, but only 11 formal complaints were filed and only 4 findings of responsibility;[14] and

- 103 incidents were reported to the Title IX Office between July 2019 and June 2020 but only 9 formal complaints were filed and only 5 findings of responsibility.[15]

---

[12] https://www.brown.edu/about/administration/title-ix/sites/brown.edu.about.administration.title-ix/files/uploads/AnnualOutcomeReportsOctober2017_final%20%281%29.pdf    (last    visited August 15, 2023).

[13] https://www.brown.edu/about/administration/title-ix/sites/brown.edu.about.administration.title-ix/files/uploads/106390_OIED_Title%20IX%20Annual%20Outcomes%20Report_0419%20FNL_0.pdf (last visited August 15, 2023).

[14] https://www.brown.edu/about/administration/title-ix/sites/brown.edu.about.administration.title-ix/files/uploads/Title%20IX%20Annual%20Outcomes%20Report_2018-2019.pdf    (last    visited August 15, 2023).

[15] https://www.brown.edu/about/administration/title-ix/sites/brown.edu.about.administration.title-ix/files/uploads/TIXAnnualReport20192020_FNL.pdf (last visited August 15, 2023).

44.     Brown's Title IX Office also regularly fails to provide survivors of sex/gender-based discrimination and/or harassment who report sexual abuse or misconduct with supportive measures, as required by Title IX and its own policies.

45.     Brown's insufficient response to Jane's reports of Title IX violations subjected Jane to further harassment and created a sexually hostile and toxic environment on campus.

46.     Jane suffered harm as a direct and indirect result of Brown's common pattern of actions and inactions, as detailed herein.

## BROWN'S PREFERENTIAL TREATMENT OF ITS MEN'S LACROSSE TEAM

47.     Brown prioritized its decision making around its highly-profitable and successful men's lacrosse program.

48.     In April, 2019, Brown announced plans to build a new $25 million soccer and lacrosse facility.[16]  The three-story, 22,500-square-foot state-of-the-art facility was completed in February 2020.[17]

49.     The excessive expenses and resources allocated to the lacrosse program were at the expense of and detriment to Jane and other similarly situated students.  Instead of appropriately and lawfully responding to female students sexual assault complaints, like Jane's, Brown had a history and culture of failing to hold male students, and especially male student athletes, accountable for their acts of sexual misconduct against female students.  Brown's favoritism towards the male lacrosse players is evidenced by its response to Jane's rape, as detailed below.

---

[16] https://www.golocalprov.com/sports/video-brown-announces-plans-for-new-soccer-lacrosse-facility (last visited August 15, 2023)
[17] https://www.brown.edu/news/2019-04-03/center (las visited August 15, 2023).

## JANE'S RAPE

50.     Assailant raped Jane when she was a first-year, freshman student at Brown.  At the time of her rape, Jane lived on Brown's campus at Champlin Hall and was a member of Brown's women's gymnastics team and Brown's Air Force ROTC program.

51.     At the time of his rape, Assailant was a member of Brown's highly-successful men's lacrosse team.  He lived at 161 Waterman Street, which is directly adjacent to Brown's campus, with multiple other senior-year members of the men's lacrosse team.  161 Waterman Street was commonly known as the "senior lacrosse house."

52.     Assailant raped Jane in the early morning hours of October 30, 2021 after the two saw each other at a party on the night of October 29, 2021.  The party took place at 247 Hope Street, where several "junior" members of the Brown men's lacrosse team resided.  This residence was commonly known as the "junior lacrosse house" and also known as "the shack." Approximately 40 male Brown students "pre-gamed" in the basement of the junior lacrosse house that evening—38 of whom were members of Brown's men's lacrosse team.  The residents of the junior lacrosse house hired a "doorman" for their party and provided the doorman with a list of 200 people permitted to attend.

53.     Jane and Assailant left the party and together walked back to the senior lacrosse house, where Assailant resided. Jane was not intoxicated at the junior lacrosse house or at any time thereafter, including at the time that she left the party with Assailant.  Several hours earlier, before attending the party at the junior lacrosse house, Jane had consumed somewhere between 2 or 3 hard seltzers, but did not drink the entirety of those beverages.  Upon arriving at the junior lacrosse house and for the remainder of the evening, Jane consumed only water.  By the time Jane had left the junior lacrosse house with Assailant, she was not intoxicated and had not consumed any alcoholic beverage for several hours.

14

54.    The senior lacrosse house is approximately one to two blocks away from Brown's athletic facilities.  At that time, fourteen senior lacrosse players lived in that house.  Assailant lived on the third floor.  He did not share a bedroom, but he shared bathroom facilities with several other individuals residing there.

55.    Inside Assailant's room, he and Jane began kissing and taking their clothes off, which Jane consented to.

56.    Assailant then asked Jane to perform oral sex, which she had previously told him that she was not comfortable engaging in and had a severe aversion to doing.  On the early morning of October 30th, Jane again told Assailant that she was uncomfortable and did not want to engage in oral sex, and refused to do so.

57.    Assailant ignored her refusal and repeatedly and aggressively demanded that Jane perform oral sex on him.  His demeanor frightened Jane.  Assailant then took Jane's head physically in his hands, forcibly moved her head down to his penis, and forced her to perform oral sex on him.  His hands remained on the back of Jane's head, forcing her to continue.  Assailant admitted that he had his hands on Jane's head and applied some level of pressure.  Jane gagged the entire time.  Brown's final investigative report from Jane's initial Title IX Complaint also notes that Assailant acknowledged that Jane was gagging from time to time while she was performing oral sex.  Jane did not consent to performing fellatio.

58.    Assailant then stood up and took a pill from the table.  When Jane asked Assailant what the pill was for, he replied, "It makes you hard."

59.    Assailant then put on a condom and got on top of Jane.  Jane was frightened by his conduct.  Assailant then penetrated Jane vaginally with his penis.  Assailant's penetration hurt Jane instantly and she cried out for Assailant to "please stop."  Assailant ignored her plea and continued

to penetrate Jane vaginally without her consent and with aggression and force even though it caused Jane a great amount of pain. Jane mentally disassociated. Her body stiffened and she did not actively participate in the sexual intercourse. Assailant penetrated Jane vaginally in various positions for over 40 minutes without her consent.

60.      After approximately 40 minutes, Assailant screamed out "what the fuck" and turned on the lights. Jane looked down and saw that she was bleeding profusely from her vagina and that her blood was all over the side of the bed and floor. Despite causing her severe injuries, Assailant never asked Jane if she needed help or medical attention. Instead, he berated her for the blood, screaming "What the fuck is wrong with you?! What the fuck is wrong with you?!" While Jane stood naked and trembling in fear from Assailant's aggression, Assailant continued to scream at Jane so close to her face that he pushed her back against the wall.

61.      Assailant became locked on the idea that Jane had her period even though she repeatedly told him that she did not. He repeatedly screamed at her for not telling him that she was on her period while physically leaning into her face.

62.      Assailant then wrapped a towel around himself and went to the bathroom. When he came back, he ordered Jane to go clean herself in the bathroom. She requested a towel to cover herself, but he refused to give her one, forcing Jane to walk naked down the communal hallway in the senior lacrosse house to the communal bathroom. While walking towards the bathroom, Jane saw Assailant showing pictures of his penis covered in Jane's blood from her injuries to a fellow lacrosse player in the hallway.

63.      While Jane was in the bathroom, Assailant took pictures and videos of the blood in his room and of his naked body and genitals covered in blood and sent those pictures and videos to a group chat and over SnapChat to other members of Brown men's lacrosse team who also lived

at the senior lacrosse house.  In those messages, Assailant and other members of the team joked about Assailant's rape of Jane and the injuries he caused her.  One of Assailant's friends responded "is that poor little girl okay" and "did you rape her or was it actually consensual."  Assailant also asked his friends, "Am I a criminal?" to which one of his friends responded "Triple homicide."

64.    In response to Assailant's snapchat videos, other members of the senior lacrosse house seemed to acknowledge the horror of Jane's injuries while simultaneously joking about what Assailant had done.  Other members of Brown's lacrosse team responded in the chat group by referring to the incident as a "war crime," joking that Assailant's "penis looks like a weapon," and another stating that he would "snort" the blood.  Only one member of the lacrosse group chat asked if Jane was okay and safe.  Instead of responding that she was okay, Assailant merely stated: "I was very sternly scolding her and then walked her home."

65.    Meanwhile, Jane attempted to take a shower, but the water was painful on her injuries.  Assailant came into the bathroom and into the shower.  When Jane tried to leave, he held onto Jane's arms, forcing her to stay naked in the shower with him while he showered.  In the shower, Assailant told Jane that the blood "didn't look like period blood" and she "should get that checked out."  Jane was not on her period at the time of the intercourse; her injuries stemmed from Assailant's forcible sexual compulsion.

66.    Assailant then pulled Jane back into his room where he again screamed at her for the blood covering his bed and floor.  Fearful of Assailant, Jane crouched down naked and bleeding and attempted to clean her blood from Assailant's room.  Assailant ripped his sheets from his bed and tossed them out of the window to a dumpster below.  He then turned to Jane, who was still naked, and said "you need to go home."

67.    Jane attempted to put back on her shorts, but they were too tight due to the vaginal tearing and swelling caused by Assailant's rape and felt very painful.  Jane asked Assailant for clothes, but Assailant denied her request telling her that she was "disgusting."  Jane then put back on her own clothes despite the severe pain.  Assailant then told Jane to come with him to the living room of the senior lacrosse house and held her there, where other members of Brown's lacrosse team had congregated.  He then insisted on walking her back to her residence hall.  Jane complied with all of Assailant's commands as she feared if she did not comply, Assailant would cause her further harm.

68.    As a result of Assailant's rape, Jane suffered severe physical injuries, including injuries to her vagina which may require surgery, and severe emotional injuries, including post-traumatic stress disorder, anxiety disorder, and depression.

69.    Specifically, Jane suffered from several days of bleeding in the days immediately following her rape and severe vaginal tearing, swelling, and pain to the point where she could not wear underwear or pants.  As a result of her injuries, she was unable to fully compete in gymnastics for the following school year and unable to wear her uniform for ROTC.

70.    Even after the bleeding stopped, Jane continued to be in daily pain for nearly a year and still suffers from regular vaginal pain.

71.    Upon information and belief, a second female Brown student was also physically and sexually assaulted by another member of Brown's lacrosse team after the same October 29, 2022 junior lacrosse party.  Like Assailant, this offender was subsequently found responsible by Brown.

18

## JANE'S TITLE IX COMPLAINT

72.    On November 4, 2021, Jane disclosed Assailant's rape to her Brown gymnastics coach, who, upon information and belief, disclosed the same to Brown's Title IX office that same day.

73.    On November 5, 2023, Jane met with a representative from the Title IX office.

74.    On November 18, 2021, Jane filed her formal Title IX Complaint.  This complaint will be referred to herein as Jane's First Formal Complaint.

75.    That day, Brown's Threat Assessment Team met regarding Jane's First Formal Complaint and recommended that Assailant be suspended pending determination of the Title IX Complaint.

76.    On November 19, 2021, Brown suspended Assailant for the pendency of the Title IX investigation.

77.    On November 30, 3021, Assailant appealed the suspension.

78.    On December 3, 2021, after conducting a hearing, the State of Rhode Island District Court granted Jane's Complaint for Protection from Domestic Abuse against Assailant and ordered that its Final Judgment – Protection from Domestic Abuse remain in full force and effect for the following three years.  Jane had originally received a temporary restraining order on November 18, 2021.

79.    On December 6, 2021, Brown partially granted Assailant's appeal, rescinding his suspension and allowing him to continue his Brown classes remotely.

80.    On December 10, 2021, Brown's Threat Assessment Team met a second time and again concluded that Assailant's "prohibited conduct was likely to continue" and affirmed Assailant's suspension, which was to take place starting on January 7, 2022 (the start of the Spring semester), pending an investigation and resolution of Jane's First Formal Complaint.

81.     On December 13, 2021, several members of Brown's men's varsity lacrosse team approached Jane in Brown's Science Library and intimidated her in retaliation for filing her First Formal Complaint.  Specifically, while Jane was studying for finals on the fourth floor, four men in Brown lacrosse sweatshirts sat down at the table next to her and started clearing their throats very loudly every 30 seconds.  Jane became very frightened, believing that she may have a panic attack.  After ten minutes, Jane decided to walk to another floor in the library.  A member from the lacrosse team followed her to the elevator bank.  She was then able to leave the library without incident.

82.     Shortly thereafter, Assailant filed a Verified Complaint in federal court against Brown claiming injunctive relief (the "Federal Court Action").

83.     Despite filing the Complaint under a pseudonym so that his own identity would be protected, Assailant pled his publicly-filed Complaint in such a way that Jane was readily identifiable from the information provided therein, including details about Jane's specific year at Brown and the extracurricular activities she was involved with, including as a member of Brown's gymnastic team and ROTC.  The identifying details included were gratuitous and had the effect of outing Jane's true identity. Assailant included this information in his publicly-filed Complaint to retaliate against Jane for her First Formal Complaint. Jane was not a party to the Federal Court Action.

84.     Because Assailant's motivations in the Federal Court Action were clearly retaliatory and because members of Brown's lacrosse team and other Brown students were actively intimidating Jane for filing the First Formal Complaint, Jane initiated a Second Formal Complaint against Assailant for Title IX retaliation on January 14, 2022.

85.    Even though Jane alleged active objective retaliation in the Second Formal Complaint, Brown took no action whatsoever on Jane's Second Formal Complaint for several weeks, failing to even assign a Title IX investigator until February 11, 2022.  During those weeks, Brown likewise took no action whatsoever with respect to the investigation into her First Formal Complaint.

86.    In early 2022, the Federal Court granted Assailant's request for a preliminary injunction, finding that Brown was enjoined from suspending Assailant and denying him class attendance and participation and the ability to continue practicing and playing on the varsity lacrosse team until Brown either (1) found him responsible for the alleged Title IX violations or (2) conducted a renewed threat assessment.

87.    On April 26, 2022, *159 days after* Jane registered her First Formal Complaint and *over 90 days after* the federal court ruled that Assailant could not be suspended unless and until he was found responsible pursuant to the First Formal Complaint, Brown issued its Investigative Report related to the First Formal Complaint.

88.    Brown's investigation into Jane's First Formal Complaint was woefully inadequate and it exhibited significant favoritism to Assailant throughout the process.

89.    For example, although Jane repeatedly informed Brown's Title IX Office of objective factual errors in Brown's reporting of witness accounts, Brown's Title IX Office failed to take any steps whatsoever to verify the accuracy of statements made in its own investigative documents and draft reports.  When Jane raised these concerns with Brown's Title IX Office Coordinator, Ebony Williams, Ms. Williams ignored Jane's concerns and disregarded them completely.

90.     When Jane approached witnesses to ensure that the statements contained in the report were accurate and truthful—after Brown ignored Jane's requests for Brown to confirm their accuracy—Brown reprimanded Jane.

91.     In stark contrast to its treatment of Jane, Brown allowed Assailant's legal team to continually interrogate investigation witnesses involved in Jane's Title IX proceedings, which witnesses were current Brown students that were actively on Brown's campus with Jane.  Upon information and belief, Brown knew that Assailant's attorneys were continually interrogating certain witnesses, but allowed the attorneys unfettered access to the witnesses all the same.  To Jane's knowledge, Assailant was not disciplined for his agent's misconduct.

92.     On May 4, 2022, Brown issued its Investigative Report pertaining to Jane's Second Formal Complaint.

93.     On May 12, 2022, ***175 days after*** Jane registered her First Formal Complaint and ***over 100 days*** after the federal court's ruling, Brown finally issued its official findings and disciplinary recommendation on the First Formal Complaint, finding that Assailant was responsible for Sexual Assault in violation of Brown's Sexual and Gender-based Misconduct Policy.  Sexual Assault, as defined by Brown's policy, includes "rape" which is defined as "[a]ttempted or completed anal or vaginal penetration of another person, no matter how slight, by a body part or object without consent and/or completed or attempted oral penetration by a sex organ of another person."

94.     As discipline for his rape, Brown stated only that it would place a notation on Assailant's transcript indicating that he had "violated Brown's policy," without stating what specific policy he violated, and that he would be banned from Brown's campus for two academic

years, despite the fact that Assailant was graduating from Brown that same month or shortly thereafter (*i.e.*, May or June  2022).

95.    Jane appealed the unsatisfactory discipline, and Assailant appealed Brown's responsibility finding.  Brown did not impose any discipline whatsoever during the appeal process and continued to permit Assailant to access campus even though it had found him responsible for sexual assault.

96.    Brown then extended and delayed the appeal process on the First Formal Complaint well into the Summer of 2022 citing "scheduling conflicts."

97.    Meanwhile, it found the time to render its finding of "no responsibility" with respect to Jane's Second Formal Complaint, issuing its findings on July 18, 2022.

98.    Brown failed to render any findings or additional discipline with respect to the First Formal Complaint, which charged Assailant with rape, until August 18, 2022.

99.    On August 18, 2022, Brown issued an Appeal Statement of Finding, Final Determination, and Rationale (the "Appeal Finding").  The Appeal Finding denied Respondent's appeal, upholding the finding of "responsible."  The Appeal Finding also granted Jane's appeal of the discipline determination by adding the additional discipline of withholding Assailant's transcripts until completion of his required consent training and clarified that Assailant's campus ban would end two calendar years after the date upon which Assailant completed consent training approved in advance by the Title IX and Gender Equity Office.

100.    The Appeal Panel's discipline finding was entirely meaningless, however.  As of the date of that finding, which was ***273 days post*** the initiation of Jane's Formal Complaint, the Assailant had already graduated from Brown and had already applied and was accepted to a graduate school program at another institution of higher education.

101.    Assailant therefore faced absolutely no consequences for his violent rape while Jane endured the physical pain and trauma from his assault and continued to suffer extreme retaliation by Brown students and faculty as a result of her decision to file a Title IX complaint.

102.    Even after Assailant graduated, facing essentially no meaningful discipline by Brown, Jane continued to endure severe retaliation due to the filing of her Title IX Complaints, including continued harassment and other retaliatory actions by members of Brown's lacrosse team and coaching staff, and from other Brown students.

103.    Following the initiation of Jane's Title IX Complaints, and continuing through the duration of Jane's freshman year (academic year Fall 2021 through Spring of 2022), Jane was repeatedly bullied and harassed by Brown students, including in particular two students who will be referenced as Student 1 and Student 2.

104.    During the Summer of 2022, given Student 1's and Student 2's prior extensive harassing, bullying, and retaliatory conduct, Jane called Brown's Office of Residential Life to inform Brown of same and to seek assistance from Brown to ensure that neither Student 1 nor Student 2 would be housed in the same dormitory as Jane for upcoming academic year (Jane's Sophomore year, Fall 2022 through Spring 2023 academic year).  During that phone call, Brown informed Jane that she was in fact housed next to Student 2, who was placed on the same floor as Jane.  Jane requested a dormitory change so that she would not be housed in the same building as Student 2.  Brown complied and switched Jane's dormitory assignment.

105.    Student 1 and Student 2's bullying and harassment of Jane continued through her Sophomore year at Brown.  Thus, in October 2022, Jane again reached out to Brown about the ongoing retaliatory conduct.   Jane e-mailed Mary Greineder, Brown's Associate Dean and Assistant Director of Student Support Services, and Kirsten Wolfe, Brown's Associate Dean and

24

Associate Director for Student Conduct & Community Standards, to notify them that she continued to be harassed and bullied by Student 1 and Student 2 in retaliation for Jane's filing of her Title IX Complaints. Jane disclosed that she had been cornered and verbally accosted by Student 1 at a party and that the boyfriend of Student 2 spat at Jane outside of Brown's dining hall, which Student 2 then bragged about on social media.

106. Jane requested that Brown mediate the matter. On October 28, 2022, Dean Wolfe stated that she was not permitted to engage in any discussion collectively with Jane and the perpetrators of her harassment. Instead, Dean Wolfe told Jane that she would speak with Jane's bullies without Jane present. Dean Wolfe stated that she had spoken with both Student 1 and Student 2 as of November 2. Neither Student 1 nor Student 2 were disciplined. On November 9 and November 16, 2022, Jane informed Brown that Student 2 was continuing to bully her regarding her Title IX Complaints. Student 2's harassing and bullying conduct continued throughout the remainder of Jane's Sophomore year at Brown. Brown took no action to address Jane's concerns.

107. In addition to Student 1's and Student 2's Title IX retaliatory harassment, Jane was also harassed by coaching staff of the Brown lacrosse team in retaliation for the filing of her Title IX Complaints. On at least ten occasions between December 2022 and March 2023, one of Brown's assistant men's lacrosse team coaches approached Jane in Brown's weightlifting room and stared at her menacingly for several minutes each time in an effort to intimidate Jane for her previous Title IX Complaints against Assailant, a Brown lacrosse team member. Although Jane reported the Brown lacrosse coach's conduct to her Brown gymnastic coaches on several different occasions, Brown did not take any action against the assistant lacrosse coach to Jane's knowledge.

108. At the end of August 2023, Jane was planning her return to Brown's campus to commence her Junior year (Fall 2023 through Spring 2024 academic year). On September 1, 2023,

Jane learned from one of her friends who had already moved back to Brown's campus that Student 2 had moved into the same dormitory that Jane had been assigned to, and was located only several doors down from Jane's assigned room on the same hall and floor. Jane was scheduled to move into her new dormitory room that same day, and had previously coordinated her move back to Brown's campus with her mother, who had scheduled time off from work to assist Jane with her move in process. Thus, Jane was not able to delay her move back to Brown as she needed her mother's assistance with that move.

109. Jane was extremely surprised and concerned to learn that Student 2 had again been placed by Brown in a dormitory unit not only in the same building as Jane but also on the same floor and a few doors down from Jane's assigned room. During the prior academic year, as detailed above, Jane had made Brown aware of Student 2's extensive harassment and bullying of Jane and Brown staff had previously switched Jane's housing assignment so that she would not be housed in the same building as Student 2. Also due to Jane's change of housing during the prior academic year to relocate Jane away from Student 2, Jane was informed by Brown or led to believe by Brown that her student file contained a notation of the prior change of housing and that Student 2 would not be housed in the same dormitory as Jane moving forward.

110. On September 1, 2023, Jane immediately contacted Brown's Office of Residential Life to inform them that Student 2 had yet again been placed in Brown dormitory housing not only in the same building as Jane but on the same floor as Jane, and to request an immediate room change. Jane spoke with David Cavallaro, Assistant Director, Administration Operations at Brown, about the situation. Mr. Cavallaro expressed to Jane that he was similarly shocked to learn that Jane had been housed in the same building and on the same hall as Student 2 as Mr. Cavallaro stated that he recalled relocating Jane the prior academic year to remove Jane from the same

building as Student 2 and explained that there should have been a notation made in Jane's file about this housing accommodation. After several hours of telephonic conversations with that Office, Brown informed Jane that day that they could move her 6 floors down, but in the same building as Student 2.

111.    Jane moved into her dormitory on September 1, 2023.  After about one hour in the dormitory, Jane was walking to the communal dormitory kitchen in the building just as Student 2 was exiting the elevator on the same floor.  Jane and Student 2 saw each other, but did not speak, and continued on their separate ways.

112.    The next morning, on September 2, 2023, Jane received an aggressive, hostile, and threatening email from Student 2, which e-mail made implicit references to Jane's Title IX Complaints, and was sent in further retaliation for Jane's filing of same.  The e-mail caused Jane to further fear for her safety on Brown's campus.

113.    On September 4, 2023, Jane e-mailed Dean Greineder and Dean Wolfe about the e-mail she received from Student 2 and her significant concerns about her safety on Brown's campus.  In that email, Jane forwarded Student 2's e-mail and expressed that she was significantly concerned about her safety and well-being at Brown due to Student 2's threatening remarks and especially because she remained in the same dormitory building as Student 2.  Jane also reiterated her request for Brown to change her housing assignment to a different dormitory building, and requested a no-contact order against Student 2.

114.    Dean Wolfe subsequently emailed David Cavallaro, explaining that the Office of Student Conduct "had vetted" Jane's concerns regarding Student 2 and "support[ed]" her relocation.  Dean Wolfe also separately responded to Jane to inform her that she could assist Jane in instituting a no contact order with Student 2.

115. On September 7, 2023, Mr. Cavallaro e-mailed Jane that he was able to provide her with an "emergency room change" to a new dormitory building.

116. On the evening of September 7, 2023, Jane moved into a new dormitory building.

117. On September 18, 2023, Jane was granted a no contact order with Student 2. Due to Brown's policy, the no contact order is mutual between Jane and Student 2.

118. To Jane's knowledge, Student 2 has never been disciplined by Brown for any of Student 2's conduct as detailed herein.

119. To this day, Jane continues to fear for her safety and well-being on Brown's campus, continues to suffer from retaliation by Brown students, and has suffered extreme emotional harm and distress from both Brown and Assailant's conduct, as detailed herein.

120. Also as a result of all of the foregoing conduct, Jane missed several weeks of class and received an incomplete in one course. Additionally, Jane was forced to reduce her class capacity and was unable to join extra-curricular activities including, but not limited to, joining a research lab and the Brown Daily Herald.

121. Also as a result of all of the foregoing conduct, Jane has suffered and continues to suffer severe emotional harm, including post-traumatic stress disorder, anxiety disorder, and depression, all of which have manifested through physical and behavioral symptomology, including panic attacks and significant weight gain. Jane also incurred extensive physical injuries from her underlying assault that continue to cause her pain to this day.

### COUNT I – VIOLATION OF TITLE IX
**Deliberate Indifference to Sex/Gender Discrimination**
**20 U.S.C. §§ 1681, *et seq*.**
**Against Defendant Brown University**

122. Plaintiff hereby incorporates by reference the allegations set forth in the above paragraphs as if fully set forth herein.

123.    Plaintiff alleges violations of Title IX against Brown due to its deliberate indifference to sex/gender-based discrimination.

124.    Brown receives federal funds and is thus covered by Title IX's prohibition on sex/gender-based discrimination.

125.    Brown created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX because:

(a)    As a female student seeking equal access to educational programs and activities at Brown, Plaintiff was a member of a protected class covered by Title IX;

(b)    Plaintiff was subjected to sex/gender-based discrimination in the form of sexual assaults, sexual harassment, relationship violence, and/or stalking;

(c)    Plaintiff was subjected to harassment based on her sex; and

(d)    Plaintiff was subjected to a hostile educational environment created by Brown's lack of policies and procedures and failure to properly investigate and/or address the sexual assault and harassment perpetrated on Plaintiff.

126.    At all relevant times, Brown exercised substantial control over Assailant who, at all relevant times, was enrolled at Brown.

127.    Brown had actual knowledge of the sex/gender-based discrimination, which was created and furthered by its repeated failure to adequately respond to Plaintiff's allegations of sex/gender-based discrimination in the First and Second Formal Complaints consistent with Brown's own policies and federal law and guidance.

128.    Brown acted with deliberate indifference to acts of sexual misconduct by failing to take immediate, effective remedial steps to resolve Plaintiff's allegations of sex/gender-based discrimination.

129.    Brown's repeated failure to promptly and appropriately respond to the sexual misconduct Plaintiff experienced resulted in her exclusion, on the basis of her sex, from

participation in, being denied the benefits of, and being subjected to discrimination in Brown's educational programs and activities in violation of Title IX.

130.    Brown acted intentionally and with deliberate indifference to the repeated denial of Plaintiff's access to educational opportunities or benefits.  Brown's violation of its duty to the Plaintiff arises from its systemic failure to properly enforce Title IX.  Contrary to its own policies, Brown cultivated a culture of silence by failing to report complaints of sex/gender-based discrimination, initiate and/or conduct adequate and timely investigations and grievance procedures under Title IX, and ensure victimized students had equal access to educational opportunities and benefits or grievance procedures.

131.    The Title IX failures by Brown were so severe, pervasive, and objectively offensive that Plaintiff was denied equal access to Brown's educational opportunities and benefits, including that Jane lost her academic focus, stopped attending classes, saw her grades slip, and was both unable to participate in activities she had previously regularly completed at Brown and missed opportunities to participate in other new opportunities and benefits at Brown.

### COUNT II – VIOLATION OF TITLE IX
**Hostile Environment**
**20 U.S.C. §§ 1681, *et seq*.**
**Against Brown University**

132.    Plaintiff hereby incorporates by reference the allegations set forth in the above paragraphs as if fully set forth herein.

133.    Plaintiff alleges violations of Title IX against Brown due to the hostile environment created on Brown's campus.  Brown receives federal funds and is thus covered by Title IX's prohibition on sex/gender-based discrimination.

134.    As a female student seeking equal access to educational opportunities and benefits at Brown, Plaintiff was a member of a protected class covered by Title IX.

135.    The abuse described in this Complaint, perpetuated by Brown employees and students, created an abusive and sexually hostile educational environment on Brown's campus that impeded and effectively denied Plaintiff's equal access to educational opportunities and benefits.

136.    Plaintiff's sexual assault and the ongoing retaliation she received from Brown employees and Brown students, including Assailant and his friends and agents, after filing her First Formal Complaint and Brown's subsequent Title IX failures, were so severe, pervasive, and objectively offensive that Plaintiff was denied equal access to Brown's educational opportunities and benefits.

137.    Brown is liable for its abusive and hostile educational environment because it had actual knowledge of Assailant's acts of sex/gender-based discrimination against Plaintiff, but allowed him to continue to have unfettered access to campus and permitted Brown employees and Brown students, including Assailant and his friends and agents, to continue harassing and retaliating against Jane after she filed her First Formal Complaint.

138.    Brown is also liable for its failure to remedy the hostile educational environment experienced by Plaintiff by failing to offer Plaintiff appropriate interim support measures and accommodations that could have provided Plaintiff with equal access to educational opportunities and benefits and by failing to discipline and prevent Brown employees and Brown students, including Assailant's friends and agents, from continuing to harass Jane.

139.    Brown is also liable for its failure to remedy the hostile educational environment by failing to initiate and conduct proper investigations into the Title IX violations that Plaintiff suffered, appropriately sanction Assailant, and provide appropriate follow-up support and accommodations to Plaintiff, thus ensuring that she received equal access to educational opportunities and benefits.

140.    Brown failed to conduct fair, equitable, unbiased, and thorough investigations into Plaintiff's First and Second Formal Complaints; failed to hold Brown students and employees accountable for their acts of sexual misconduct, discrimination, and retaliation; and failed to remedy any hostile environment that was created as a result of the sex/gender-based discrimination.

141.    This hostile environment perpetuated by Brown was so severe, pervasive, and objectively offensive that Plaintiff was denied equal access to Brown's educational opportunities and benefits, including that Jane lost her academic focus, was forced to take a reduced class load and missed classes, and could not participate in extracurricular activities she had previously completed, and was unable to participate in and thereby missed out on other new educational opportunities and benefits.

142.    As a direct, natural, and proximate result of Brown's violation of Title IX by creating and perpetuating a sexually hostile environment, Plaintiff has suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefits, loss of income, and other economic and non-economic damages.

## COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against Brown University

143.    Plaintiff hereby incorporates by reference the allegations set forth in the above paragraphs as if fully set forth herein.

144.    Plaintiff alleges intentional infliction of emotional distress by Brown in its response to Plaintiff's reports of sexual misconduct.

145.    Brown engaged in extreme and outrageous conduct by failing to timely and appropriately investigate and render decision on Plaintiff's First Formal Complaint, dismissing Plaintiff's Second Formal Complaint, failing to properly discipline Assailant, and failing to adequately and properly discipline and take responsive action to the extensive retaliation Jane faced and continues to face by Brown students and employees, including providing appropriate accommodations requested by Jane, which conduct knowingly and intentionally caused Jane to suffer severe emotional distress.

146.    As a result of Brown's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress, including, but not limited to depression, anxiety, post-traumatic stress disorder, and other such injuries and physical manifestations as may appear during the course of discovery and trial in this matter.  Brown is aware of such emotional distress suffered by Plaintiff.

147.    As a direct, natural, and proximate result of Brown's intentional infliction of emotional distress, Plaintiff has suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefits, loss of income, and other economic and non-economic damages.

### COUNT IV – NEGLIGENCE
### Against Defendant Brown University

148.    Plaintiff hereby incorporates by reference the allegations set forth in the above paragraphs as if fully set forth herein.

149.    Plaintiff alleges negligence by Brown in its response to Plaintiff's reports of sexual misconduct and retaliation.

150.    At all relevant times, Brown owed Plaintiff a duty of reasonable care to ensure her safety and freedom from sex/gender-based assault, harassment, and abuse by, among other things, conducting an adequate and timely investigation into her claims of sex/gender-based assault, sexual misconduct, and abuse, and enforcing the Title IX Policy.

151.    At all relevant times, Brown also owed Plaintiff a duty of reasonable care to ensure she was not retaliated against for engaging in the protective activity of filing her Title IX Complaints.

152.    Brown was aware that Plaintiff had been subject to sexual misconduct and took no reasonable protective measures to protect Plaintiff nor took timely action to prevent its recurrence or remedy its effects.

153.    Brown's failure to follow its own policies in reviewing, investigating, and resolving complaints of sexual assault and harassment in an adequate and timely manner allowed Assailant to remain on campus long after Brown had assessed him as a threat to its students and long after it had found him responsible for sexually assaulting Plaintiff, which constitutes a breach of its duty of care to Plaintiff.

154.    Brown has also failed to address the extensive retaliation that Plaintiff has suffered and continues to suffer from Brown students and employees in response to Plaintiff's Title IX Complaints, which constitutes a further breach of Brown's duty of care to Plaintiff.

155.    As a direct and proximate result of Brown's negligence, Plaintiff has sustained injuries and damages, including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss

of educational benefits, loss of income and other economic or non-economic damages, for which she is entitled to just compensation.

156.     Plaintiff is entitled to monetary compensation for past damages and injunctive relief from Brown, as damages alone are not an adequate remedy for the Brown's ongoing negligence.  Brown is also vicariously liable for the damages caused by its employees.

## COUNT V – NEGLIGENT SUPERVISION
### Against Defendant Brown University

157.     Plaintiff hereby incorporates by reference the allegations set forth in the above paragraphs as if fully set forth herein.

158.     Plaintiff alleges negligent supervision by Brown in its response to reports of sexual misconduct.  Brown had a duty to properly supervise, train, and monitor its employees and students and to ensure those employees' and students' compliance with all applicable statutes, laws, regulations, and institutional policies, but they failed to do so and therefore breached the duties of care owed to Plaintiff as alleged herein.

159.     Brown's failure to timely report and investigate the physical violence, sexual misconduct, and retaliation perpetrated against Plaintiff, or to monitor the Title IX investigation and response process at Brown, is a breach of its duty to supervise.

160.     As a direct and proximate cause of Brown's conduct, actions, and/or inactions Plaintiff has sustained injuries and damages, including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, loss of educational benefit, loss of income and other economic and non-economic damages, and other such injuries and physical manifestations as may appear during the course of discovery and trial in this matter, for which she is entitled to just compensation.

## COUNT VI – VIOLATION OF RHODE ISLAND CIVIL RIGHTS ACT
### R.I. Gen. Laws. § 42-112-1, *et seq*.
### Against Defendant Brown University

161.    Plaintiff hereby incorporates by reference the allegations set forth in the above paragraphs as if fully set forth herein.

162.    Plaintiff alleges violation of the Rhode Island Civil Rights Act, § 42-112-1, *et seq.*

163.    Brown, by and through its agents, servants, employees and/or those for whose conduct it was responsible, interfered with the personal, contractual, and property rights of the Plaintiff and with her right to the full and equal benefit of all laws and proceedings for the security of persons.

164.    Brown's deliberate failure to enforce compliance with the requirements set forth under the RICRA violated the rights of Plaintiff to equal protection of the law, created a hostile education environment, and substantially interfered with Plaintiff's access to educational opportunities or benefits.

165.    Brown's discriminatory actions or inactions were motivated by Plaintiff's sex/gender and amounted to reckless or callous indifference to Plaintiff's protected rights.

166.    As a direct, natural, and proximate result of Brown's violation of the RICRA, Plaintiff has suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefit, loss of income, loss of enjoyment of life, and other economic or non-economic damages, for which she is entitled to just compensation.

## COUNT VII – BATTERY
**Against Defendant Stiles**

167.    Plaintiff hereby incorporates by reference the allegations set forth in the above paragraphs as if fully set forth herein.

168.    Without Jane's consent, Assailant sexually assaulted Jane by penetrating Jane orally, then vaginally, with his penis.  Jane asked Assailant to stop, but he failed to do so at any point in time.

169.    Assailant's sexual assault was intended to cause, and in fact did cause, an offensive contact with Jane's body, which she did not consent to and which caused her immense bodily trauma and injury, which constitutes the tort of battery under Rhode Island state law.

170.    As a direct, natural, and proximate result of Assailant's battery, Plaintiff has suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, fright, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefit, loss of income, loss of enjoyment of life, and other economic or non-economic damages, for which she is entitled to just compensation.

## COUNT VIII – ASSAULT
**Against Defendant Stiles**

171.    Plaintiff hereby incorporates by reference the allegations set forth in the above paragraphs as if fully set forth herein.

172.    Without Jane's consent, Assailant sexually assaulted Jane by penetrating Jane orally, then vaginally, with his penis.

173.    Assailant forced Jane's head and mouth down to his penis and held Jane's head there, forcing Jane to perform oral sex on Assailant without her consent.  Said act was of a threatening nature and placed Jane in reasonable fear of imminent bodily harm.

174.    Assailant then raped Jane vaginally, causing her significant pain and serious physical injuries.  Said act was of a threatening nature and placed Jane in reasonable fear of imminent bodily harm.

175.    After discovering her injuries, Assailant then aggressively berated Jane for the blood covering his sheets and floor.  Assailant's threatening, intimidating, and aggressive tone and demeanor and his physical proximity to Jane, which behavior immediately followed his sexual assault of Jane, placed Jane in reasonable fear of imminent bodily harm.

176.    As a direct, natural, and proximate result of Assailant's assault, Plaintiff has suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, fright, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefit, loss of income, loss of enjoyment of life, and other economic or non-economic damages, for which she is entitled to just compensation.

## COUNT IX – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against Defendant Stiles

177.    Plaintiff hereby incorporates by reference the allegations set forth in the above paragraphs as if fully set forth herein.

178.    Plaintiff alleges intentional infliction of emotional distress caused by Assailant's oral and vaginal rape of Jane and Assailant's threatening, intimidating, and aggressive conduct following Jane's sexual assault.

179.    By raping Plaintiff orally and vaginally, causing significant vaginal injury, berating her for the amount of blood that poured from her injuries, forcing her to walk naked and bleeding down a communal hallway in the senior men's lacrosse house, and making her get on her hands and knees naked and bleeding to clean up her own blood, and forcing her to walk home with Assailant, Assailant engaged in extreme and outrageous conduct and specifically intended for his conduct to cause Plaintiff to suffer severe emotional distress.

180.    Assailant further engaged in extreme and outrageous conduct that specifically intended to cause Plaintiff to suffer severe emotional distress as Assailant intentionally disseminated pictures, videos, and messages of the scene of the sexual assault, Jane's blood covering Assailant's genitalia, body, and bedroom, and text messages intended to mock, embarrass, and humiliate Jane.  Assailant disseminated these pictures, videos, and messages to at least several other members of Brown's men's lacrosse team, which pictures, videos, and messages identified Jane explicitly.

181.    As a result of Assailant's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress, including, but not limited to depression, anxiety, post-traumatic stress disorder, and other such injuries and physical manifestations as may appear during the course of discovery and trial in this matter.  Assailant is aware of such emotional distress suffered by Plaintiff.

182.    As a direct, natural, and proximate result of Assailant's intentional infliction of emotional distress, Plaintiff has suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial

of access to educational benefit, loss of educational benefits, loss of income, and other economic and non-economic damages.

## PRAYER FOR RELIEF

For all the foregoing reasons, Plaintiff prays for judgment against Defendants as follows:

A.    An award of damages to Plaintiff, including compensatory damages and common law punitive damages;

B.    An award of litigation costs and expenses, including reasonable attorneys' fees to the Plaintiff;

C.    For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law;

D.    Injunctive relief; and

E.    Any and all such additional and further relief as this Court deems just and equitable under the circumstances.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: November 3, 2023

Respectfully submitted,

*/s/ Irene R. Lax*
**GRANT & EISENHOFER P.A.**
Barbara J. Hart (*Pro Hac Vice*)
Irene R. Lax (*Pro Hac Vice*)
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel: (646) 722-8512
bhart@gelaw.com
Ilax@gelaw.com

**HERMAN LAW GROUP**
Louise A. Herman
1445 Wampanoag Trail
Suite 104
E. Providence, RI 02915
Tel: 401-655-5554
lherman@lhermanlaw.com

**GRANT & EISENHOFER P.A.**
Cynthia B. Morgan (*Pro Hac Vice*)
123 Justison Street
Wilmington, DE 19801
Tel:  (302) 622-7000
ebailey@gelaw.com
cmorgan@gelaw.com

*ATTORNEYS FOR PLAINTIFF*