**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| JANE DOE,<br>Plaintiff/Counterclaim Defendant,<br>vs.<br>BROWN UNIVERSITY,<br>Defendant/Crossclaim Defendant,<br>and<br>JOHN STILES,<br>Defendant/Crossclaim and Counterclaim Plaintiff. | Case No.: 1:23-cv-00376-WES-LDA<br>JURY DEMAND |

**JOHN STILES' CROSSCLAIM AGAINST BROWN UNIVERSITY AND COUNTERCLAIM AGAINST JANE DOE**

John Stiles alleges the following pursuant to *Fed. R. Civ. P.* 13(a), (g).

**PARTIES & PROTAGONISTS**

1. John Stiles ("John") is the crossclaim and counterclaim plaintiff, a domiciliary of New Hampshire, and a graduate of Brown University.

2. Brown University ("Brown") is the crossclaim defendant and a Rhode Island non-profit corporation located in Providence, Rhode Island.

3. Jane Doe ("Jane") is the counterclaim defendant and was John's accuser in a Title IX complaint Jane filed at Brown.

**JURISDICTION & VENUE**

4. The Court has supplemental jurisdiction per 28 U.S.C. § 1367 because John's claims are part of the same case or controversy as Jane Doe's claims.

5. The Court has power to grant declaratory relief per 28 U.S.C. § 2201 because this matter presents an actual controversy within the Court's jurisdiction.

6. This Court has personal jurisdiction over Brown because it is a citizen of the State of Rhode Island, and over Jane because she filed her complaint in this Court.

7. Venue properly lies in this district pursuant to 28 U.S.C. § 1391 because the events giving rise to John's crossclaim and counterclaim occurred in Rhode Island.

**ALLEGATIONS**

8. On November 18, 2021, Jane filed a Title IX complaint at Brown in which she alleged that John raped her.

9. Jane's allegation arose from a sexual encounter she had with John on October 30, 2021, involving oral and vaginal sex (the "Encounter").

10. The Encounter was interrupted when John discovered a large amount of blood on his bed and floor, which Jane attributed to her period.

11. An argument ensued after the Encounter as to whether Jane should have told John she was menstruating. The argument left Jane angry and embarrassed.

12. A few days later, an ROTC friend asked Jane if she had been sexually assaulted. Jane's Title IX complaint soon followed.

13. In response to Jane's complaint, Brown appointed Janet Faulkner of Faulkner Legal LLC to investigate and an all-female panel of two faculty and one student (the "Panel") to rule on the matter.

14. On May 12, 2022, after receiving the investigator's report, attached hereto as Appendix A, the Panel conducted a hearing.

15. On or about May 23, 2022, the Panel decided that the Encounter was non-consensual in regard to both oral and vaginal sex, though Brown reversed the finding in regard to oral sex.

16. The Panel's decision is contrary to the weight of the evidence, tainted by bias, and inconsistent with Brown's Title IX Grievance Procedure (the "Title IX Procedure") and Sexual and Gender-Based Misconduct Complaint Procedure (the "SGBM Procedure").

*The Panel's Findings*

17. Brown's standard for consent is "whether a reasonable person in the Respondent's position would have understood such person's words and acts as an expression of consent."

18. The Panel found that Jane's "acceptance of a condom" constituted consent to intercourse. The Panel then had to decide whether Jane did or said anything thereafter that a reasonable person would have understood as the *withdrawal* of consent.

19. The Panel found that vaginal intercourse lasted roughly 45 minutes and involved multiple sex positions.

20. In that time, Jane did not initiate any sexual positions. According to the Panel, this suggested that Jane "was not an active participant at this point."

21. The Panel's assumption that passivity was unusual for Jane had no evidentiary support. The Panel never asked if Jane usually initiated sex positions.

22. The Panel's characterization of Jane as passive ignored that John and Jane had sex in a standing position twice on October 30th, during which Jane held onto John's neck to help support her weight.

23. In its decision, the Panel recognized that the standing position "might have signaled a consensual sexual encounter to the Respondent," but ruled otherwise because of "non-consensual oral sex, which the Complainant claims shifted the power dynamics between them."

24. The Panel's ruling on oral sex was overturned on appeal, but Brown nonetheless left in place the finding on intercourse.

25. The Panel claimed that communication "mostly ceased" after the oral sex, but failed to explain how this reasonably communicated the withdrawal of consent.

26. The Panel asserted that Jane "was unable to provide affirmative consent given her 'mental dissociation' due to the already sustained mental and physical distress."

27. Mental dissociation is a recognized mental disorder, but Jane did not claim she had been diagnosed and neither Brown's investigator nor anyone on the Panel was capable of making a diagnosis.

28. As for the allegation that Jane told John to "please stop," Jane claims to have said that only once at the beginning of the 45-minute encounter.

29. John denies that Jane asked him to stop and Jane concedes that she did not repeat it when she and John changed positions.

30. Jane did not call attention to her request that John "please stop" when she and John discovered the blood on the bed and the floor.

31. Jane was not crying or wincing during sex or pushing John away.

32. There is no claim that John threatened Jane during sex in any way.

*The Panel's Bias*

33. In explaining why it believed the Encounter was non-consensual, the Panel fixated on the blood on John's bed and floor, rather than how Jane may have communicated the withdrawal of consent.

34. The Panel took a dim view of John's harsh reaction to the blood, but failed to consider that Jane told John that the blood was from her period and that this explanation reasonably suggested to John that Jane was not hurt.

35. The Panel failed to consider that Jane's explanation reasonably suggested that Jane had been inconsiderate in failing to mention that she was menstruating, which in turn led to an awkward situation and soiled bedding.

36. The Panel misconstrued the evidence in concluding that "that night both Parties acknowledged that the blood was not related to the Complainant's period, as evidenced in a text exchange between them." The text message, which was Exhibit 9B, Stiles 47,[1] came later in the day after the sexual encounter, not on the night of the encounter, and would not reasonably factor into whether Jane communicated the withdrawal of consent.

37. The morning after the Encounter, in a groupchat to her teammates, Jane wished everyone a good morning and then described her night as follows:

> Literally so embarrassing … but I was w [Respondent] and I'm the middle of sex my period luke started again idk. I hadn't had it for a more than a day. But there was blood EVERYWHERE amd he was like rlly mean about it…"

See Exhibit 15A, Stiles 48-55. The Panel ignored this evidence that Jane did, in fact, attribute the blood to her period.

38. The Panel failed to recognize that nowhere in the investigative report did it say that Jane told John on the night of their Encounter that the blood was not period blood.

39. The Panel failed to recognize that Jane argued with John over whether he had a right to know she was menstruating.

---

[1] All exhibits referenced herein are the exhibits the investigator filed with her report and are included in the attached Appendix A, which is Bates-numbered Stiles 1 through Stiles 87, starting with the report.

40. The Panel wrongly found that John "showed no concern for [Jane] when it became clear she was bleeding;" the evidence showed that while in the shower, John said to Jane: "That doesn't look like period blood. You should get that checked out."

41. The Panel failed to acknowledge several inconsistencies in Jane's account or question her regarding multiple instances of apparent deception.

42. The day after their Encounter, Jane sent John an angry text saying she went to the doctor and confirmed that it was not her period, but that John had cut her. See Exhibit 9A, Stiles 56. John apologized, but Jane had not gone to the doctor and just wanted John to feel bad. See Appendix A, p. 18, Stiles 18. The Panel did not question Jane on the deception.

43. The same day Jane lied to John about going to the doctor and told him the blood was not from her period, she told her friends that it was. See Exhibit 15A, Stiles 48-55. Subsequently, to convince the Panel that it was not her period, Jane claimed that the statement to her friends was a lie. The Panel did not question Jane on the deception.

44. In the police report Jane later filed regarding the Encounter, Jane said regarding oral sex that she "obliged without being forced to." Later, when interviewed by the investigator, Jane claimed this was "obviously wrong." The Panel did not question Jane on this inconsistency.

45. In her Title IX complaint, Jane said:

> I was in a lot of pain and started fearing for my life . . . I was so scared that I was shaking. This is when I realized I was not safe at all and that I needed to find a way to get out without provoking him further . . . It was all I could do to move closer toward getting out.

But, the morning after the encounter, Jane lamented to her friends, "Like deadass made me go home." See Exhibit 15A, Stiles 48-55. The Panel did not question Jane on this inconsistency.

46. Despite the assertion that she was fearing for her life, when John left to use the bathroom, Jane took a video of the blood on the bed and floor with her phone. See Appendix A, p. 16, Stiles 16. The Panel did not ask why she did not attempt to leave or use the phone to call for help.

47. Jane also attempted to hide evidence from the Panel. For instance, Jane asked Witness 12 not to mention to the investigator that she had said the blood was from her period. The Panel did not question Jane about this interference.

48. In her Title IX complaint, Jane stated she had lunch with some of her teammates and "told them about the bleeding and nothing more." Her messages, however, showed that Jane told her friends, "I'm the middle of sex my period luke started again …." See Exhibit 15A, Stiles 48-55. Jane failed to share this message with the investigator until someone else did. See Appendix A, p. 31, Stiles 31. The Panel did not question Jane about her recalcitrance.

49. In conversation with another friend, Witness 1, Jane suggested that John had cut her vagina with his finger or a ring. Appendix A, p. 39, Stiles 39. That is what Witness 1 told the investigator. But, when asked about this, Jane denied that John penetrated her vagina with his hand and said that she "could not even imagine what that would be like or why anyone who would want that…it's obscene."

50. Jane subsequently solicited Witness 1 to change her account. Jane wrote:

> Sorry to switch to here but they're gonna subpoena my phone to court and I just want to be able to be straight up with you I'm not here to like "change what you say" or anything bc i obv trust you but… long story short, in court and stuff I've been saying he never fingered me or anything. I had assumed it was a cut bc he had told me it was a cut. Turns out it was just torn from it all but the important thing here is that you saying that statement in particular helps his case so there's a high chance you could get mandatorily called into the criminal court to testify for him.

See Exhibit 34, part 1, Stiles 57-60. Witness 1 replied, "Honestly I'd rather not change my statement bc that was what was said to me . . . ." See Exhibit 34, part 2, Stiles 61-69.

51. Though Jane overtly "switch[ed] to here," i.e., Snapchat where messages auto-destruct, and did so to try to influence Witness 1 without any evidence of that on her phone, the Panel did not question Jane about this interference.

52. Shortly after the Encounter, Jane told Witness 11 that she wrote down what happened because she wanted to remember everything. See Appendix A, pp. 37, 39, Stiles 37, 39.

53. In the district court, Jane said she prepared her complaint on the basis of her notes. See Exhibit 26, pp. 113-14, Stiles 72-73. However, when asked what notes she had, Jane replied, "I don't know." See Exhibit 26, p. 114, Stiles 73. When asked where they are, she again replied, "I don't know." See Exhibit 26, p. 115, Stiles 73. Asked what the notes consist of, Jane said, "Individual pieces of paper." See Exhibit 26, pp. 115-16, Stiles 73. When asked what she did with those pieces of paper, Jane replied, "I don't know." See Exhibit 26, p. 116, Stiles 73. As to whether she threw them away, Jane again said, "I don't know." See Exhibit 26, p. 116, Stiles 73.

54. Subsequently, Jane told the investigator that she gave her notes to the Providence Police. However, the record from her visit to the Providence Police Department says nothing about her notes. See Appendix A, p. 40, Stiles 40; Exhibits 25A, 25B, Stiles 74-81. Their disappearance did not concern the Panel.

55. In the course of her investigation, the investigator also learned that it was Jane who wanted a particular sentence changed in the investigator's draft report, not Witness 10. See Appendix A, p. 32, n.30, Stiles 32. And, it was Jane who wanted Witness 7 to ask for changes regarding the timeline because she was unsure at what point the

encounter became nonconsensual. See Appendix A, p. 35, n.32, Stiles 35. Again, the Panel did not question Jane about her interference.

56. Witness 12 was the first person Jane talked to after her encounter with John, and Jane asked the investigator to change parts of the investigation report about Witness 12. But, when the investigator followed up with Witness 12, Witness 12 was reluctant to speak. See Appendix A, p. 45, Stiles 45.

57. Witness 12 told the investigator she was confused about how to proceed and was trying to maintain a civil relationship with Jane. See Appendix A, p. 45, Stiles 45.

58. Witness 12 sought to speak confidentially with the investigator, but her request was denied. See Appendix A, p. 45, Stiles 45.

59. Ultimately, Witness 12 came forward after she left the Air Force ROTC and no longer had to see Jane at ROTC activities. Witness 12 told the investigator that she was bothered by Jane's handling of her complaint. She said that Jane discussed it frequently during Air Force activities, that she made jokes and comments to the effect of she's suing John, and if she wins she'll get millions of dollars, and that she "should get sexually assaulted more often." See Appendix A, p. 45, Stiles 45.

60. Jane told the Panel that it was a "weird situation" and that Witness 12 had inexplicably started making up "weird things" about her. The Panel accepted Jane's explanation and refused to allow John to call Witness 12 at his hearing because it might be "prejudicial" to Jane.

61. When the Panel learned that John recorded Jane's public, in-court testimony regarding the Encounter and shared it with his friends along with his incredulous responses, the Panel deemed him "condescending to the needs of the Complainant" and found this to be evidence that Jane withdrew consent during the Encounter.

62. Another fabrication related to how intercourse started. In her complaint, Jane claimed that as soon as oral sex ended, "[h]e then flipped me over to penetrate me vaginally with his penis." Jane later conceded that John had to get up and find a condom. He then put on the condom, got the lubricant, and returned to the bed. Jane, who "previously had been sitting on the bed," then "laid down on her back." John got on top of her and intercourse began. Appendix A, p. 11, Stiles 11.

63. Jane's original claim that John immediately flipped her over and vaginally penetrated her was false. The Panel did not question Jane about this inconsistency.

64. Another notable claim in Jane's complaint was that from Sunday to Tuesday, November 2, she "was emotionally numb, going through the motions, and physically in a lot of pain - it was hard to walk normally or go to the bathroom." At the district court hearing, Jane also added that on Wednesday she "couldn't wear underwear." See Exhibit 26, p. 38, Stiles 71.

65. Jane's claims of being unable to wear underwear and struggling to walk were contradicted by Instagram photos of her attending a mixer with the swim team the night after the Encounter. She was wearing a ballerina skirt, smiling, and posing for the camera in a ballerina-like pose. See Exhibits 16A and 16B, Stiles 82-87. The pictures suggest that Jane had the bleeding well under control and was, in fact, able to walk and wear underwear.

66. In response to the Instagram photos, Jane claimed that the mixer was mandatory. See Appendix A, p. 32, Stiles 32. Her claim was incorrect. It was not participation in the mixer that was mandatory, but participation in Bruno Gives Back Day. Nonetheless, the Panel accepted Jane's explanation.

*The Panel's Misapplication of § 2.9.2*

67. Section 2.9.2 of the SGBM Procedure states that prior sexual history "will only be considered as evidence when offered to prove that someone other than the Respondent committed the offense or if . . . offered to prove consent."

68. In his interviews with the investigator, John tried multiple times to compare the Encounter with Jane with their prior sexual encounter. In response, the investigator stopped John, pointed to § 2.9.2, and stated that the prior sexual encounter was not relevant.

69. On the basis of § 2.9.2, John was never allowed to provide a full description of his prior encounter with Jane even though his purpose was "to prove consent."

70. In its decision, the Panel stated that "the dynamics of this sexual encounter differed substantially from the descriptions of the first encounter." This reference to "the descriptions" mischaracterizes the evidence because John was not allowed to provide a full description of the prior encounter.

71. The Panel's reliance on the incomplete descriptions is inconsistent with § 2.9.2 because the Panel relied on the prior encounter as evidence of a lack of consent, which is not a permissible purpose under § 2.9.2.

72. The Panel's reliance on information that John, as the respondent, was not allowed to address was fundamentally unfair.

## **<u>JOHN STILES' CROSSCLAIM AGAINST BROWN UNIVERSITY</u>**

### **COUNT I**

*Violation of the SGBM Procedure*

73. John re-avers paragraphs 1-72 as if fully set forth in this count.

74. Brown maintains a variety of school policies, including the Student Conduct Procedures and the SGBM Procedure.

75. As an enrolled member of the Brown community, the Student Conduct Procedures and SGBM Procedure afford John certain rights that are contractual in nature.

76. The Student Conduct Procedures entitle John to, *inter alia*, "not be presumed responsible of any alleged violations unless so found through the appropriate student conduct hearing" and to be "afforded an opportunity to offer a relevant response."

77. The SGBM Procedure further guarantees John that the procedure "is grounded in fairness and support for all parties, and includes procedural protections that ensure nondiscrimination, adequate notice and meaningful opportunities to participate" in the adjudication process, and the implied covenant of good faith and fair dealing ensure that Brown does not perform its duties in such a way as to deny John "the fruits of the contract."

78. The SGBM Procedure did not meaningfully afford John a hearing because it severely restricted his ability to call or cross-examine witnesses and contained a "presumption . . . that the investigator has identified and interviewed all relevant witnesses and supplied the information necessary for the Hearing Panel to render its decision and determine sanctions."

79. The Panel breached Brown's contract with John by evaluating the evidence with a bias in Jane's favor, by ignoring fabrications and inconsistencies in Jane's account, by failing to question Jane on her deception, her interference with Witnesses 1, 7, 10, and 12, and the loss of her notes, by limiting John's defense to a seven-minute statement and no ability to call witnesses, and by misapplying § 2.9.2 to prohibit John from addressing evidence the Panel ultimately relied upon.

80. In this manner, the Panel failed to afford John his rights to a fair hearing, to be assumed "not responsible" for Jane's allegations, to be "afforded an opportunity to offer

a relevant response" to evidence the Panel relied upon, and to meaningfully participate in the hearing by calling witnesses.

81. In conducting itself as it did, the Panel violated the covenant of good faith and fair dealing by convening a hearing while harboring bias and employing procedures that undermined its purpose.

82. As a result of Brown's actions and breach of contract, John has suffered damages in the form of a two-year banishment from campus, a transcript notation, and reputational harm.

WHEREFORE, John Stiles requests that the Court: (1) enter judgment declaring the Panel's failure to afford John the process he reasonably expected under the provisions of the Student Conduct and SGBM Procedures, and (2) direct Brown to vacate the findings of the Panel's May 12, 2022 hearing.

**COUNT II**
*Application of Wrong Policy*

83. John re-avers paragraphs 1-82 as if fully set forth in this count.

84. Brown maintains two separate policies to address accusations of sexual misconduct: the Title IX Procedure and the SGBM Procedure.

85. Unlike the Title IX Procedure, the SGBM Procedure is not Title IX compliant, does not include express provisions for cross-examination and imposes a seven-minute limit on remarks to the Panel. Compare SGBM Procedure, § 2.9.4, with Title IX Procedure, § 2.9.4.4.

86. Unlike the Title IX Procedure, the SGBM Procedure does not allow parties to present evidence at the hearing, call witnesses to testify, question the investigator, or suggest questions for the hearing panel to ask.

87. Since receipt of Jane's complaint, Brown's communications with John have identified the SGBM Procedure as the bases for its actions.

88. The plain language of the two procedures indicates that the Title IX Procedure was, in fact, the applicable policy.

89. Section 2.0 of both procedures begins with the following language:

> This procedure applies to Students and Employees as defined in the Policy when: . . . the conduct occurs off-campus, in the United States . . . .

From that point on, the provisions diverge. The SGBM Procedure continues as follows:

> outside of the context of a program, activity, or location when Brown exercises substantial control over both the Complainant and Respondent, and the effects of the Prohibited Conduct have a continuing discriminatory effect at Brown.

Whereas, the Title IX Procedure states:

> in the context of a program, activity, or location in which Brown exercises substantial control over both the Respondent and the context in which the alleged Prohibited Conduct occurred, including but not limited to off-campus research, internship, mentorship, summer session, clerkship, graduate student fellowship or other affiliated programs.

90. Because the location of the Encounter was John's student residence, which is on the perimeter of Brown's campus, surrounded by Brown-owned buildings, inhabited exclusively by Brown students, and within the jurisdiction of the Brown University Police, Brown has "substantial control" over the location.

91. Because Brown has disciplined the students who reside at John's residence for "Disruption of the Community" on the bases of the residents' parties and noise, Brown has in fact exercised "substantial control" over the location.

92. Because both Jane and John were students, were enrolled in the Fall semester 2021 undergraduate program, and were team members in Brown University Athletics when the Encounter occurred, they were not "outside of the context of a program,

activity, or location when Brown exercises substantial control over both the Complainant and Respondent" as the SGBM Procedure requires. Rather, they were "in the context" of such a program and Brown had substantial control over both of them. Therefore, the Title IX Procedure is the applicable procedure.

93. In addition to the foregoing, both procedures contain exclusions in § 2.0. The SGBM exclusion reads as follows:

> Exempt from these procedures is Prohibited Conduct defined in the Sexual and Gender-Based Harassment, Sexual Assault, Interpersonal Violence, and Stalking Policy.

By contrast, the Title IX exclusion provides:

> Exempt from these procedures is Prohibited Conduct engaged in by an individual unaffiliated with the University or outside of the University's control and/or conduct that occurs (a.) abroad, or (b.) outside the context of a Brown University employment, education, or research program or activity. Formal Complaints related to the aforementioned conduct (a. & b.) will be addressed through the appropriate Code of Conduct and/or policy.

94. The Prohibited Conduct at issue here was sexual assault. The "Prohibited Conduct defined in the Sexual and Gender-Based Harassment, Sexual Assault, Interpersonal Violence, and Stalking Policy" includes sexual assault. Accordingly, per the wording of the SGBM exclusion, John's alleged Prohibited Conduct is expressly exempt from the SGBM Procedure.

95. As for the Title IX exclusion, the alleged conduct was inside, not "outside the context of a Brown University employment, education, or research program or activity." Therefore, the only procedure applicable to John was the Title IX Procedure.

96. John requested that his proceeding follow the Title IX Procedure and that he be afforded all rights applicable to respondents thereunder, including the right to cross-examination. Brown erroneously denied that request, denied him the ability to call and

cross examine witnesses, and limited his time allowed to address the Panel regarding the investigator's 46-page report and 35 exhibits to seven minutes.

WHEREFORE, John Stiles requests that the Court: (1) enter judgment declaring his right to cross examination and more than a seven-minute response time in accordance with the Title IX Procedure, and (2) direct Brown to vacate the findings of the Panel's May 12, 2022 hearing.

**JOHN STILES' COUNTERCLAIM AGAINST JANE DOE**

**COUNT III**
*Defamation*

97. John re-avers paragraphs 1-96 as if fully set forth in this count.

98. Jane made a false and defamatory statement about John by accusing him of "rape" on October 30, 2021, involving oral and vaginal sex.

99. Jane published her false and defamatory statement to Brown by setting forth her accusation in her Title IX complaint and reiterating it before the Panel at the May 12, 2022 hearing, and to the Providence Police as demonstrated by the police report Jane filed regarding the Encounter on December 2, 2021.

100. Jane's publication of her false and defamatory statement to Brown was not privileged because the May 12, 2022 hearing lacked procedural safeguards, such as an oath requirement, cross-examination, the ability to call witnesses, the meaningful assistance of counsel, and an adequate transcript or record for appeal.

101. Jane's publication of her false and defamatory statement to the Providence Police was not privileged because she uttered the statement with malice in the form of ill will and without a reasonable belief as to its truth.

102. Jane published her false and defamatory statements with "actual malice" because she knew her allegations were false as shown by the evolution of her story and efforts to prevent friends from revealing what she told them earlier about the Encounter.

103. Jane published her false and defamatory statements with "malice in fact" because she made her allegations for an improper purpose, namely "the express purpose to have the Respondent expelled from Brown without conferral of his bachelor's degree."

104. Jane's false and defamatory statements are actionable as slander *per se* because they impute the crime of rape on John, which is a felony under Rhode Island law.

WHEREFORE, John Stiles requests that the Court enter judgment against Jane Doe in an amount determined by the trier of fact for the mental suffering and humiliation Jane's false and defamatory accusation caused him, and for the reasonable attorney's fees he incurred while defending himself in the university proceeding.

**JURY DEMAND**

Defendant John Stiles demands a trial by jury on all issues so triable.

Dated: November 3, 2023

The Crossclaim Defendant,
John Stiles, by his Attorney,

/s/ J. Richard Ratcliffe

J. Richard Ratcliffe, #2603
Ratcliffe Harten Galamaga LLP
40 Westminster Street, Suite 700
Providence, RI 02903
Tel: (401) 331-3400
Fax: (401) 331-3440
rratcliffe@rhgllp.com

## CERTIFICATE OF SERVICE

I, J. Richard Ratcliffe, certify that on November 3, 2023, this document was electronically filed through the Court's CM/ECF system and is available for viewing and downloading to all registered counsel of record.

/s/ J. Richard Ratcliffe