UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JANE DOE,<br>    Plaintiff/Counterclaim Defendant,<br>vs.<br>BROWN UNIVERSITY,<br>    Defendant/Crossclaim Defendant,<br>and<br>JOHN STILES,<br>    Defendant/Crossclaim and<br>    Counterclaim Plaintiff. | Case No.: 1:23-cv-00376-WES-LDA |

**MEMORANDUM IN SUPPORT OF
JOHN STILES' OBJECTION TO JANE DOE'S MOTION TO DISMISS**

Jane Doe's motion to dismiss lacks merit because John Stiles did not rape Jane and he has alleged an abundance of facts establishing that Jane's allegation is false. Moreover, her claim is not privileged because Brown's Title IX proceeding was a matter of personal rather than public concern, was not "quasi-judicial" and was driven by malice.

**FACTS AND TRAVEL**

John Stiles is a graduate of Brown University and was the accused in a Title IX complaint filed by Jane Doe on November 18, 2021 "with the express purpose to have [John] expelled from Brown without conferral of his bachelor's degree." (ECF 29, para. 103). Jane's allegation arose from a sexual encounter she had with John on October 30, 2021, involving oral and vaginal sex (the "Encounter"). (ECF 29, para. 9). The Encounter was interrupted when John discovered a large amount of blood on his bed and floor, which Jane attributed to her period. (ECF 29, para. 10). An argument ensued after the Encounter as to whether Jane should have told John she was menstruating. (ECF 29, para. 11). The argument left Jane angry and embarrassed. (ECF 29, para. 11).

A few days later, an ROTC friend asked Jane if she had been sexually assaulted. (ECF 29, para. 12). Jane's Title IX complaint soon followed. (ECF 29, para. 12). Brown ultimately found in Jane's favor, but its decision was contrary to the weight of the evidence, tainted by bias, and inconsistent with its own disciplinary rules and procedures. (ECF 29, para. 16). Though dissatisfied with Brown's decision, John tried to move on. Jane then brought this action last September, and subsequently sought to publicize Brown's Title IX finding. (ECF 21, p. 3). The following details the bases for John's claim that Jane's accusation is false, defamatory, and not subject to any variety of privilege.

## STANDARD OF REVIEW

Jane brings her motion under Rule 12(b)(6) and claims that John has failed to state a claim for defamation. Under Rule 8(a), all that is required is a "short and plain statement of the claim" showing that the pleader is entitled to relief. *Fed. R. Civ. P.* 8(a)(2). To meet this standard, a party must allege sufficient facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A claim is "plausible on its face" when a plaintiff sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Contrary to the assumptions made in Jane's arguments, the Court construes the facts "in the light most favorable to the plaintiff, taking all well-pleaded factual allegations as true and giving the plaintiff the benefit of all reasonable inferences." *Pruco Life Ins. Co. v. Wilmington Tr. Co.,* 616 F. Supp. 2d 210, 217 (D.R.I. 2009).[1]

---

[1] *Pruco Life* further states that "a court may properly consider not only the complaint, but also the facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice," as well as "any document integral to or explicitly relied upon in a complaint, even if that document is not annexed to the complaint." *Pruco Life*, 616 F. Supp. 2d at 50 (internal quotations omitted).

## ARGUMENT

"Under Rhode Island law, defamation requires proof of: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) damages unless the statement is actionable irrespective of special harm." *Chrabaszcz v. Johnston Sch. Comm.,* 474 F. Supp. 2d 298, 317 (D.R.I. 2007), citing *Healey v. New England Newspapers, Inc.,* 555 A.2d 321, 324 (R.I.1989). In her motion, Jane challenges the sufficiency of John's claim on the bases of elements one and two, i.e., falsity and privilege. The following addresses how John's claim satisfies these elements.

1. <u>John has sufficiently alleged falsity regarding Jane's accusation of rape because his pleading is replete with factual detail that shows Jane was a willing participant.</u>

For purposes of defamation "[a]n assertion is false if it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Lewis v. Abramson*, 2023 WL 3322009, at 13 (D.N.H. May 9, 2023), quoting *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 517 (1991). Therefore, falsity requires a plaintiff to "plead facts that, if proven true, would allow a reasonable person to consider the assertion false." *Id*.; see also *Rule v. Fort Dodge Animal Health, Inc.,* 607 F.3d 250, 252 (1st Cir. 2010) (noting that "judges have some room to dispatch ... claims that are ... pled only in conclusory terms"). John's pleading and the attachments thereto more than suffice to meet this standard.

There is no dispute that Jane assumed on the night of October 29-30 that she would be going home with John. (EFC 35, at Stiles 8). She and John had had sex before and ran into each other at a party at the Junior Lacrosse House. (EFC 35, at Stiles 8, 10). As the party was shutting down, Jane and John left together and walked to John's house. (EFC 35, at Stiles 8). They went directly to his bedroom, where they began kissing and removing their clothing. (EFC 35, at Stiles

10).  Oral sex followed.  (EFC 35, at Stiles 10).  Jane claims it was coerced, but Brown ultimately rejected that claim.  (EFC 35, at Stiles 10; ECF 29, para. 24).

Once oral sex ended, Jane claimed that John immediately flipped her over and penetrated her vaginally with his penis.  (ECF 29, para. 62-63).  Later, she conceded that that was not quite true.  (EFC 35, at Stiles 11).  First, John stood up, got a condom and asked, "Do I need this?"  (EFC 35, at Stiles 11; ECF 29, para. 62).  Jane responded, "Umm, yeah."  (EFC 35, at Stiles 11).  Jane also told John "that she wanted to use lubricant."  (EFC 35, at Stiles 13-14).  John then came over to the bed, put on the condom, and put lubricant on his penis and Jane's vagina.  (EFC 35, at Stiles 13; ECF 29, para. 62).  Jane, who had been sitting on the bed facing John, then laid down on her back.  (EFC 35, at Stiles 11; ECF 29, para. 62).

Before intercourse began, John asked Jane, "Do you want to fuck," and Jane said, "yes." (EFC 35, at Stiles 13).  John asserts that he first touched Jane's vagina with his hand.  (EFC 35, at Stiles 11).  Then, when intercourse began, Jane claims it "hurt right away" and that she asked John to "please stop."  (EFC 35, at Stiles 11; ECF 29, para. 28).  John denies Jane ever said this.  (ECF 29, para. 29).  In fact, John voluntarily took a polygraph examination where he was asked, "Did you hear [Complainant] tell you to 'Please stop or words to that effect'?"  (EFC 35, at Stiles 45).  The licensed polygraph examiner concluded that John was telling the truth when he answered this question in the negative.  (EFC 35, at Stiles 45).

Sex lasted roughly 45 minutes, and though the parties disagree as to whether Jane asked John to stop, Jane agrees that she never said this more than once.  (EFC 35, at Stiles 12; ECF 29, para. 19, 28-29).  John remembers their limited conversation differently.  He claims that they started out in missionary position, and then after a bit, he sat on the edge of the bed and asked Jane to "come over here."  (EFC 35, at Stiles 14).  That was all the verbal conversation they had.  (EFC

35, at Stiles 14).  Moreover, Jane complied.  She came over, sat on top of John so that they were face to face, and Jane helped John reinsert his penis.  (EFC 35, at Stiles 14).

As sex continued, John and Jane changed positions several more times, and Jane has admitted that she may have been on top at times.  (EFC 35, at Stiles 12; ECF 29, para. 19).  John recalls that after the missionary and seated positions, the couple moved into a standing position in which John supported most of Jane's weight, but Jane assisted by hanging onto John.  (EFC 35, at Stiles 14; ECF 29, para. 22).  They then sat back down on the bed with John still penetrating Jane.  (EFC 35, at Stiles 14).  While sitting, John was not thrusting, but the two remained face to face and were kissing.  (EFC 35, at Stiles 14).  Then, the two moved back into a standing position just as before and repeated the sequence, with Jane assisting by hanging onto John.  (EFC 35, at Stiles 14).  At no point did John ever threaten Jane during sex.  (ECF 29, para. 32).  Jane was not crying, wincing, or pushing John away.  (ECF 29, para. 31).  Quite the opposite, she was hanging onto him and kissing him.  (EFC 35, at Stiles 14).

During the last round of intercourse while standing, John felt a burst of liquid inside of Jane.  (EFC 35, at Stiles 15).  He thought this was a biological, sexual response.  (EFC 35, at Stiles 15).  A similar thing had happened the last time he and Jane had sex.  (EFC 35, at Stiles 15).  John stopped thrusting and sat down on the bed with Jane still on top of him.  (EFC 35, at Stiles 15).  He then felt something abnormal on his leg, told Jane to "hold on," and went to turn on the light.  (EFC 35, at Stiles 15).  When he did so, John was shocked by the amount of blood he saw and asked Jane what had happened.  (EFC 35, at Stiles 15).  Jane did not say you raped me or I told you to stop; she said, "I don't know it could have been my period.  My period ended the day before."  (EFC 35, at Stiles 15; ECF 29, para. 30).

Jane's response angered and annoyed John.  (EFC 35, at Stiles 15).  The two disagreed as to whether Jane should have mentioned her period before having sex.  (EFC 35, at Stiles 15).  And,

Jane never said she was in any pain. (EFC 35, at Stiles 16). John then left Jane in his room, went to the bathroom and turned on the shower for her. (EFC 35, at Stiles 16). John left Jane alone at least two other times. (EFC 35, at Stiles 16). One was when Jane went to shower and another was when John went to find cleaning supplies. (EFC 35, at Stiles 16). While John was getting cleaning supplies, Jane used her phone to take a video of the blood rather than calling for help. (EFC 35, at Stiles 16). In her Title IX complaint, Jane claimed:

> I was in a lot of pain and started fearing for my life . . . I was so scared that I was shaking. This is when I realized I was not safe at all and that I needed to find a way to get out without provoking him further . . . It was all I could do to move closer toward getting out.

(ECF 29, para. 45). Jane told the Providence Police that "after the assault, [John] took a shower at that residence, and at some point [she] was able to flee the location." (EFC 35, at Stiles 80). Jane later conceded that this was "obviously wrong." (EFC 35, at Stiles 42). In fact, despite being left alone three times, Jane never tried to leave. (ECF 29, para. 46). The morning after the encounter, Jane lamented to her friends, "Like deadass made me go home." (ECF 29, para. 45).

Considering the foregoing, the Court must disregard Jane's contention that she never "waivered [*sic*] from her statement that the sexual encounter was non-consensual." (ECF 40-1, p. 16). Moreover, her repeated citation of *Swerdlick v. Koch*, 721 A.2d 849 (R.I. 1998) regarding "exaggerated or slightly off the mark" statements does not change the standard of review, and "[t]here are few statements that carry comparable defamatory sting as being wrongfully accused of sexual assault." *Doe v. Roe,* 295 F. Supp. 3d 664, 678 (E.D. Va. 2018). Viewing the facts "in the light most favorable to the plaintiff, taking all well-pleaded factual allegations as true and giving the plaintiff the benefit of all reasonable inferences," John's counterclaim is more than sufficient to plausibly support his claim that Jane's allegation of rape is false, not merely exaggerated.

2. <u>Jane's publication of her rape accusation to Brown was not protected by absolute privilege because John's hearing lacked the procedural safeguards required of a quasi-judicial process.</u>

"Generally, absolute privilege is afforded in the context of judicial proceedings to encourage witnesses to come forward and speak freely about civil or criminal matters." *Ims v. Town of Portsmouth*, 32 A.3d 914, 928 (R.I. 2011), citing *Rioux v. Barry*, 927 A.2d 304, 308 (Conn. 2007) (indicating that absolute immunity bars defamation claims that arise from statements made in the course of judicial or quasi-judicial hearings). The key to "whether absolute privilege applies to a particular communication is determining whether it was made in the context of a judicial or quasi-judicial proceeding." *Id*. The Rhode Island Supreme Court has never determined whether a student disciplinary proceeding is quasi-judicial. Other courts, however, have addressed the issue.

In *Khan v. Yale University*, the Second Circuit asked the Connecticut Supreme Court to determine the quasi-judicial status of a student disciplinary proceeding. *Khan v. Yale University*, 295 A.3d 855, 862 (Conn. 2023); *Khan v. Yale University*, 85 F.4th 86, 88 (2d Cir. 2023). The case involved an accusation of rape against Saifullah Khan, an undergraduate student at Yale University. *Id*. at 864. After a hearing, Yale expelled Mr. Khan. *Id*. at 866. In the U.S. District Court for the District of Connecticut, Mr. Khan sued his accuser, Ms. Doe, for defamation. *Id*. The District Court reluctantly granted Ms. Doe's motion to dismiss on grounds of absolute immunity. *Id*. On review, the Second Circuit concluded that the appeal hinged on an unsettled "question of Connecticut state law – namely, whether quasi-judicial immunity extends to proceedings" like the one at Yale. *Id*. at 867; *Khan,* 85 F.4th at 88. It therefore certified the issue to the Connecticut Supreme Court. *Id*.

The Connecticut Supreme Court began its analysis with a recognition that "those accused of crimes, especially as serious a crime as sexual assault, are entitled to fundamental fairness before

being labeled a sexual predator." *Id*. at 863.  Moreover, "the accused's right to fundamental fairness is no less important than the right of the accuser or the larger community to achieve justice." *Id*.  Accordingly, a basic requirement of any quasi-judicial proceeding is that it "contains procedural protections against defamatory statements." *Id*. at 870.  In this regard, Yale's proceeding fell short.

To begin, Yale did not require that Mr. Khan's accuser testify under oath, swear to the truth of her statements, or submit to cross-examination. *Id*. at 879-80.  Though "Khan and Doe were able to submit questions that they wanted the … hearing panel to ask, the panel had sole discretion to reject the questions or not to ask them." *Id*. at 881.  This denied Mr. Khan "a fundamental procedural protection essential to quasi-judicial proceedings …." *Id*., accord *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018) and *Doe v. Allee*, 30 Cal. App. 5th 1036, 1039 (2019).  Moreover, the Yale proceeding did not allow Mr. Khan to call witnesses, which "deprived [him] of a fair opportunity to present a defense." *Id*. at 881-82.  Another serious failing was the limitation on the participation of counsel. *Id*. at 882.  Mr. Khan's attorney "could not present any argument, either orally or in writing, on Khan's behalf, raise objections, or be present during – let alone participate in – the questioning of witnesses," which "effectively rendered counsel irrelevant." *Id*.  Finally, review of the decision was limited because Yale "failed to establish an adequate record of the proceedings." *Id*. at 882-83.  There was no "transcript or recording of statements, testimony, or questions raised." *Id*. at 883.  For these reasons, the proceeding did not qualify as quasi-judicial. *Id*.

The Connecticut Supreme Court's decision is not unique.  It is preceded by the decision of the District Court in *Doe v. Roe,* 295 F. Supp. 3d at 675 ("Marymount's proceedings against Doe did not have the required guarantees of due process and fairness and therefore were not quasi-judicial"), as well as federal appellate decisions.  For example, in *Overall v. University of*

*Pennsylvania,* 412 F.3d 492 (3d Cir. 2005), in an opinion penned by then-Circuit Judge Samuel Alito, the Third Circuit declined to recognize a private university proceeding as quasi-judicial because quasi-judicial proceedings "involve basic procedural safeguards," whereas Pennsylvania's proceeding did not require sworn testimony and no one kept a transcript of what was said during the hearing. *Id*. at 498.[2]

In the case at bar, John's proceeding at Brown suffered the same procedural shortcomings as were cited in *Khan* and *Overall*. His May 12, 2022 hearing "lacked procedural safeguards, such as an oath requirement, cross-examination, the ability to call witnesses, the meaningful assistance of counsel, and an adequate transcript or record for appeal." (ECF 29, para. 100). While a statement that a proceeding lacked procedural safeguards, without more, would be conclusory, John's claim is not so limited. In his pleading, John explains which safeguards were lacking. His averment regarding the absence of an oath requirement is factual, as are his claims that no cross-examination was allowed, that he could not call witnesses, and that there was no transcript or record of the proceeding.

For these reasons, if a Rhode Island court were called upon to determine whether John's disciplinary proceeding is quasi-judicial, it would likely look to the Connecticut Supreme Court for guidance, as it has in the past. See, e.g., *Ims v. Town of Portsmouth*, 32 A.3d 914, 928 (R.I. 2011) (addressing "the doctrine of absolute privilege … in the context of judicial or quasi-judicial proceedings"), citing *Rioux v. Barry*, 927 A.2d 304, 308 (Conn. 2007). The result would be a finding that the proceeding was not quasi-judicial.

---

[2] The Third Circuit also noted that "the defendants could not point to any case, in Pennsylvania or elsewhere," in which a private proceeding was held to be quasi-judicial. *Overall, 412 F.3d*. at 498; see also *Cuba v. Pylant*, 814 F.3d 701, 716 (5th Cir. 2016) (holding that Southern Methodist University, "a private institution that does not have any law enforcement or law interpreting authority," cannot hold quasi-judicial proceedings).

Should the Court doubt the analysis in *Khan*, or for that matter, the analyses presented in *Doe v. Roe*, 295 F. Supp. 3d 664 (E.D. Va. 2018) or *Overall v. University of Pennsylvania*, 412 F.3d 492 (3d Cir. 2005), the absence of binding precedent compels the Court to certify the question to the Rhode Island Supreme Court. *W. Rsrv. Life Assur. Co. of Ohio v. ADM Assocs., LLC*, 737 F.3d 135, 136 (1st Cir. 2013) ("the Rhode Island Supreme Court is the ultimate arbiter of matters of Rhode Island law"). Otherwise, the lack of procedural safeguards is sufficient to place absolute privilege well outside Jane's reach.

3. <u>Jane's rape accusation is not subject to qualified privileged because Jane made the statements with malice.</u>

"Unlike absolute privilege, a qualified privilege may be lost if the allegedly defamatory statement is the product of ill will or malice." *Ims*, 32 A.3d at 930. The rule in Rhode Island is "that ordinarily malice is a question of fact for the determination of a jury." *Atkinson v. Birmingham*, 117 A. 274, 274 (R.I. 1922); accord *M & B Realty, Inc. v. Duval*, 767 A.2d 60, 66 (R.I. 2001) ("a finding of malice or lack of malice is a question of fact not ordinarily susceptible to summary judgment").

In the case at bar, Jane was quite clear as to her purpose in filing her Title IX complaint. She filed it for "the express purpose to have the Respondent expelled from Brown without conferral of his bachelor's degree." (ECF 29, para. 103). In other words, Jane did not just seek to be free of any worries regarding John's presence on campus. She wanted retribution. She wanted Brown to deny John, who was a fourth-year student, the conferral of his degree. This "express purpose," not to mention her efforts during this litigation to publicize Brown's finding, betrays Jane's malice. But, in addition, the evidence of Jane's knowledge of the falsity of her narrative speaks volumes. And, other jurisdictions have held that false accusations of sexual assault suffice as evidence of malice. See *Chastain v. Hodgdon*, 202 F. Supp. 3d 1216, 1221 (D. Kan. 2016);

*Linetsky v. City of Solon,* 2016 WL 6893276, at 12 (N.D. Ohio Nov. 23, 2016) ("False sexual assault accusations suggest malice"); *L.S.S. v. S.A.P.,* 523 P.3d 1280, 1288 (Colo. Ct. App. 2022) ("A statement is published with actual malice if it is published with actual knowledge that it was false"); *McDonald v. Wise*, 769 F.3d 1202, 1220 (10th Cir. 2014) (holding defamation claim sufficient where the plaintiff "pled sufficient facts to raise a reasonable inference, for the purposes of surviving a motion to dismiss, that the statement was not made in good faith").

The decision in *Chastain* is informative. In *Chastain*, a Kansas City politician brought a defamation action in response to a detailed accusation of rape posted to Facebook. *Id*. at 1218-19. As a public figure, he had to show "clear and convincing evidence" that the post was made "with actual knowledge that it was false or with reckless disregard of whether it was false or not." *Id*. at 1221. Moving to dismiss, the defendant argued that Mr. Chastain "cannot provide evidence that defendant knew the allegations regarding the sexual assault or attempted rape were false and therefore cannot show actual malice." *Id*. at 1221. The court rejected this argument and held that "[i]f the complaint alleges facts that raise a reasonable inference that defendant did not believe what she published and therefore, she knew she was making a false statement, or at least had reckless disregard for the truth, it is not appropriate to dismiss the complaint for failure to plead malice." *Id*. at 1221. In other words, if the defendant knew her accusation to be false, "it is axiomatic that she wrote the narrative with actual malice." *Id*. at 122;

In his counterclaim, John has made an abundance of allegations that bear on Jane's knowledge of the falsity of her allegations. To begin, John has alleged in paragraphs 98 and 102 that Jane's allegations are false and that she knew they "were false as shown by the evolution of her story and efforts to prevent friends from revealing what she told them earlier about the Encounter." (ECF 29, paras. 98, 102). For example, "[t]he morning after the Encounter, in a

groupchat to her teammates, Jane wished everyone a good morning and then described her night as follows:

> Literally so embarrassing … but I was w [Respondent] and I'm the middle of sex my period luke started again idk. I hadn't had it for a more than a day. But there was blood EVERYWHERE amd he was like rlly mean about it…"

(ECF 29, para. 37). Jane failed to share this message with Brown's investigator until someone else did. (ECF 29, para. 48). In fact, she even asked Witness 12 not to mention to the investigator that she had said the blood was from her period. (ECF 29, para. 47). The reasonable inference is that Jane sought to present a false narrative, and the combination of this message and Witness 12's account did not support the narrative she wished to present.

In conversation with another friend, Witness 1, Jane suggested that John had cut her vagina with his finger or a ring, and that is what Witness 1 told Brown's investigator. (ECF 29, para. 49). But, when asked about this, Jane denied that John ever penetrated her vagina with his hand. (ECF 29, para. 49). In fact, she claimed she "could not even imagine what that would be like," to be touched by John's hand. (EFC 35, at Stiles 11, n.12). In speaking to Brown's investigator, Jane wondered aloud, "why anyone who would want that … it's obscene." (EFC 35, at Stiles 11, n.12). Jane subsequently solicited Witness 1 to change her account. (ECF 29, para. 50). Jane even overtly "switched" to Snapchat to continue the conversation to avoid leaving any evidence of her attempt to influence Witness 1. (ECF 29, para. 51). To her credit, Witness 1 replied, "Honestly I'd rather not change my statement bc that was what was said to me . . . ." (ECF 29, para. 50). The investigator also learned that it was Jane, not Witness 7, who wanted changes to Witness 7's account, and that it was Jane, not Witness 10, who wanted changes to Witness 10's account. (ECF 29, para. 55).

Communications with witnesses are not the only thing Jane tried to hide. "Shortly after the Encounter, Jane told Witness 11 that she wrote down what happened because she wanted to

remember everything." (ECF 29, para. 52). Those notes, however, have disappeared without a trace. (ECF 29, paras. 53-54). At times, Jane has claimed simply not to remember what happened to her notes. (ECF 29, para. 53). Other times, she claims to have given them to the Providence Police. (ECF 29, para. 54). Yet, the Providence Police have no record of ever having received them. (ECF 29, para. 54). The reasonable inference, again, is that Jane wished to present a false narrative, and her notes did not support the narrative she wanted to present. See also *Ryan v. Astra Tech, Inc.,* 772 F.3d 50, 62 (1st Cir. 2014) (observing that the usual remedy for spoliation is an adverse inference).

Other evidence of deceit in Jane's complaint stems from her claim discussed above that she was "fearing for my life . . . and that I needed to find a way to get out . . . ." (ECF 29, para. 45). Yet, John left Jane alone at least three times and Jane never attempted to leave. (ECF 29, para. 46). The next morning, Jane even lamented to her friends, "Like deadass made me go home." (ECF 29, para. 45). The reasonable inference here is that Jane's description of her emotions in her complaint was, at best, recklessly inaccurate. The same can be said regarding Jane's claim in her complaint that from Sunday to Tuesday, November 2, she "was emotionally numb, going through the motions, and physically in a lot of pain – it was hard to walk normally or go to the bathroom." (ECF 29, para. 64). Photographic evidence posted to Instagram shows Jane attending a mixer on Sunday, the night after the Encounter. (ECF 29, para. 65). The photos show Jane wearing a ballerina skirt, smiling, and posing for the camera in a ballerina-like pose. (ECF 35 at Stiles 86-87). Jane's decision to attend a party in costume and playfully pose for photos undermines her claim that she was severely compromised on both an emotional and physical level.

Based on the foregoing, John's counterclaim alleges several facts that raise a reasonable inference that Jane knew that the narrative in her complaint was false, or at least a reckless disregard for the truth. That knowledge or disregard is evidence of malice, as is the "express

purpose" to deny John his degree that Jane set out in her complaint. Given these averments of malice, John's counterclaim is plausible and Jane's qualified privilege argument is insufficient to defeat it as a matter of law.

4. <u>Jane's accusation is not subject to conditional immunity because it is a matter of personal concern decided through a non-governmental process.</u>

The immunity afforded under Rhode Island's Anti-SLAPP statute applies to matters of "public concern" and attempts to use "governmental process[es]." See G.L. 1956, § 9-33-2(a). Plainly, Brown's Title IX panel is not a "legislative, executive, or judicial body." And, as argued above, Brown's Title IX process was not quasi-judicial. Therefore, the Title IX proceeding was in no manner a governmental process. Moreover, Rhode Island courts distinguish between matters of public concern and matters of personal concern. Section 9-33-2 only applies to the former. See *Hoffman v. Davenport-Metcalf*, 851 A.2d 1083, 1088 (R.I. 2004).

In *Hoffman*, Lester Hoffman filed an action against Judy Davenport-Metcalf alleging retaliation, intentional infliction of emotional distress, abuse of process, and malicious prosecution. *Id*. at 1086. Mr. Hoffman's complaint stemmed from a variety of lawsuits Ms. Metcalf had filed against him, ranging from civil actions for eviction and slander to a criminal prosecution for making crank telephone calls. *Id*. Moving to dismiss, Ms. Metcalf claimed conditional immunity under § 9-33-2. *Id*. at 1087. The Rhode Island Supreme Court, however, held that § 9-33-2 did not apply. *Id*. The Court explained:

> We are not convinced that these causes of action involve issues of public concern sufficient to invoke the provisions of the anti-SLAPP statute. Nor are we persuaded that these are the types of activities that the Legislature intended to protect in enacting the law, and we decline to extend the purview of the anti-SLAPP statute to encompass these private causes of action and criminal complaints.

*Id*. at 1088. That is, the petitioning activity has to implicate the public, not an individual. An example is *Global Waste Recycling, Inc. v. Mallette*, 762 A.2d 1208 (R.I. 2000), in which the

Court held a group who had exercised their first amendment rights to complain about "alleged environmental problems" was protected against a defamation SLAPP suit filed by the alleged polluter. *Id*. at 1209.  The environmental problems were clearly an issue of public concern because they affected the whole community.  *Id*.; see also *Hometown Properties v. Fleming*, 680 A.2d 56, 58-59 (R.I. 1996) (holding groundwater contamination to be a matter of public concern).

Jane's Title IX complaint lies in contrast to the issues raised in *Global Waste* and *Hometown Properties*.  What Jane raised in her Title IX complaint was an issue that affected only her, not the community at large.  She made no allegation that John had assaulted any other women on campus.  And, because Title IX is about assuring equal access to educational opportunities, at issue was Jane's personal access to educational opportunities.  Universities are not equipped to determine whether an individual is a danger to the public at large.  Therefore, Jane's complaint was a matter of personal concern and nothing more.  For this reason, § 9-33-2 does not apply.

## CONCLUSION

For the reasons set forth herein, John Stiles requests that the Court deny Jane Doe's motion to dismiss his counterclaim.

Dated:  January 5, 2024

The Counterclaim Plaintiff,
John Stiles, by his Attorney,

/s/ J. Richard Ratcliffe
J. Richard Ratcliffe, #2603
Ratcliffe Harten Galamaga LLP
40 Westminster Street, Suite 700
Providence, RI 02903
Tel: (401) 331-3400
Fax: (401) 331-3440
rratcliffe@rhgllp.com

## CERTIFICATE OF SERVICE

I, J. Richard Ratcliffe, certify that on <u>January 5, 2024</u>, this document was electronically filed through the Court's CM/ECF system and is available for viewing and downloading to all registered counsel of record.

/s/ J. Richard Ratcliffe